ORDER

GEORGE C. CARLSON, JR., Presiding Justice,
for the Court.
This matter came before the Court en banc on the Court’s own motion. The Court, by order entered on September 8, 2011, granted the separate petitions for writ of certiorari filed by Timothy W. Jordan, Glenn E. Grose and Johnny Grose, through their respective counsel, as well as a petition for writ of certiorari filed by Glenn E. Grose, pro se, in order to carefully review the issues and the record in this matter. Having done so, the Court now finds that there is no need for further review, and that the writs of certiorari should be dismissed.
IT IS THEREFORE ORDERED that the four writs of certiorari are hereby dismissed.
SO ORDERED.
TO DISMISS: WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR AND PIERCE, JJ.
CHANDLER, J., OBJECTS TO THE ORDER WITH SEPARATE WRITTEN STATEMENT JOINED BY KITCHENS, J.
KING, J., NOT PARTICIPATING.
CHANDLER, Justice,
objecting to the order with separate written statement;
¶ 1. Because my review of the issues and record indicates a new trial is warranted, I do not join the Court’s order. I would reverse and remand for a new trial based upon the admission of videotaped hearsay statements in violation of the defendants’ right of confrontation guaranteed by the Sixth Amendment to the United States Constitution, and the admission of hearsay testimony given by an accomplice’s attorney.

FACTUAL BACKGROUND

¶ 2. This Court granted certiorari to review the Court of Appeals’ decision affirming the convictions of Timothy Jordan (Tim), Glenn E. Grose (Glenn), and Johnny Grose (Johnny) of multiple counts of sexual battery, gratification of lust, and child neglect concerning Tim’s daughter, A.B.[1] Jordan v. State, 80 So.3d 817 (Miss.Ct.App.2011). The defendants each received multiple life sentences after their joint trial. At the trial, evidence established that A.B. had been sexually abused over a period of several months. The State bore the burden to prove beyond a reasonable doubt that the perpetrators of that abuse were Tim, Glenn, and Johnny. The State’s evidence of their guilt consisted of a videotaped statement of A.B. in which she named Tim, Glenn, and Johnny as her abusers, A.B.’s statements to her grandmother, great-grandmother, and therapist that her abusers were Tim, Glenn, and Johnny,[2] and the testimony of A.B.’s mother, Krystal Jordan, that she had assisted Tim, Glenn, and Johnny in sexually abusing A.B. Krystal, who is mentally retarded, gave this testimony as a condition of her *2 plea agreement with the State. Tim, Glenn, and Johnny all testified and denied that they had sexually abused A.B.
¶ 3. A.B., the daughter of Tim and Krystal Jordan, was three years old at the time of the conduct alleged in the indictment. In May 2005, Tim, Krystal, and A.B. went to stay with A.B.’s great-grandmother, Martha Hester Grose, and her husband, Larry Grose, who lived with Johnny at Johnny’s trailer. Johnny was disabled from rheumatoid arthritis and confined to a wheelchair. His brother, Glenn, lived in a house on the property but was a frequent visitor to the trailer. Witnesses established that A.B. frequently was in the company or care of Tim, Glenn, Johnny, and Larry, as well as other men.
¶ 4. On October 30, 2005, A.B. disclosed to Martha that Tim, Krystal, Glenn, and Johnny had sexually abused her. ■ The next day, Martha brought A.B. to the home of her daughter, A.B.’s grandmother, Gloria Beccaril. A.B. said that Tim, Glenn, and Johnny had touched her.[3] Immediately, Beccaril contacted Rhiannon Shaw, a family-protection specialist with the Mississippi Department of Human Services (DHS). Shaw recently had begun an investigation into the conditions at the Jordan home due to a report of child neglect and that Krystal was prostituting herself in exchange for drugs.
¶ 5. Shaw arranged a forensic interview of A.B. on November 3, 2005. After the forensic interview, A.B. underwent a medical examination by a pediatrician that confirmed that A.B. had been sexually abused. The pediatrician testified that A.B. had inflammation and bruising on her genitalia and that her anus was dilated, which was the result of repeated penetration over months.

The forensic interview

¶ 6. The forensic interview was conducted by Ejeera Joiner at Family Crisis Services, a nonprofit entity. Shaw testified that she and another Family Crisis Services employee had observed the interview through a two-way mirror, and the interview was videotaped. After a pretrial hearing, the trial court admitted the videotape of the interview under the tender-years exception to the hearsay rule after finding that A.B. was unavailable to testify due to the substantial likelihood she would be psychologically traumatized by testifying. See M.R.E. 804(a)(6); M.R.E. 803(25). Shaw authenticated the videotaped interview that was played for the jury.
¶ 7. Joiner did not testify. Tomiko Mackey, an expert in forensic interviewing, testified that she had studied the videotape of A.B.’s forensic interview at the request of the district attorney’s office. She testified that Joiner had used the peer-reviewed RATAC protocol in performing A.B.’s interview. Mackey stated that the RATAC protocol allows the interviewer to make three possible findings: that the interview is consistent with abuse, that it is inconclusive, or that there are no findings of abuse.
¶ 8. On the video, Joiner established that A.B. had referred to her vagina as her “nu-nu.” Joiner asked A.B. if anyone had touched her “nu-nu” and it was not nice. A.B. responded, “Christy[4] and them,” and later, “Tim and them.” When asked who else had touched her “nu-nu,” A.B. responded, “Johnny.” Joiner then asked if someone else had touched it, and A.B. responded in the negative. Then, Joiner asked, “Who is Glenn?” A.B. had no response. Then, Joiner asked, “Tell me who *3 all touched you. You said Tim touched you, who else?” A.B. then stated, “Johnny ... Glenn.” Joiner asked where Glenn had touched her, and A.B. said “my nu-nu.” When asked where Johnny had touched her, A.B. said “nowhere.” She denied that any of the men had hurt her. A.B. pointed to her vagina when asked where they had touched her, and she said her pants were down. In succession, Joiner asked A.B. whether Tim, Glenn, Johnny, her mother, or her grandmother had ever touched her nu-nu, and she responded yes to each one. When asked if Krystal knew about the touching, A.B. said yes. In response to further questioning, A.B. indicated that she had seen Tim’s, Johnny’s, and Glenn’s penises, and that Tim and Glenn had touched her with their penises. But when asked where Tim had touched her with his penis, A.B. responded “nowhere.” Using dolls representing herself and Tim, A.B. demonstrated abuse by Tim and stated that he had put his penis in her “butt.” A.B. also stated that Tim had cut her in the side with a knife, and that Krystal had touched her “nu-nu” with a knife; Shaw testified that these two allegations were unsubstantiated.
¶ 9. Mackey testified that, due to Joiner’s departure from Family Crisis Services, she never had discussed the interview with Joiner. Mackey was critical of Joiner’s forensic interviewing techniques. She criticized Joiner’s failure to ask followup questions and her use of confusing compound questions. Also, Mackey stated that Joiner’s introduction of Glenn’s name into the interview “was wrong” because it was suggestive. Mackey was unable to explain why A.B. was inconsistent in some of her responses. However, Mackey testified that, after viewing the interview multiple times, she concluded that A.B.’s interview was consistent with sexual abuse. Mackey also created an inexact transcript of the interview that was admitted into evidence.

Krystal’s testimony

¶ 10. Krystal testified as part of her plea agreement, under which she pleaded guilty to three counts of sexual battery and one count of felony child neglect. She received twenty years, with ten years suspended, for sexual battery, and ten years for child neglect, with all sentences to run concurrently. In anticipation of Krystal’s testimony, Dr. Thomas Fowlkes testified that he had treated Krystal at the Lafayette County Detention Center. Krystal had admitted to prior drug abuse. Dr. Fowlkes testified that a court-ordered mental evaluation had concluded that Krystal was mildly mentally retarded. He stated that Krystal’s mental state had deteriorated further during the three years she had been incarcerated due to her abuse of inhalants that had caused irreversible brain damage.
¶ 11. Due to her mental deficiencies, Krystal had such difficulty testifying that the trial court permitted leading questions. Krystal testified that she routinely had had sex with Glenn and Johnny at Johnny’s trailer in exchange for drugs. She testified that she had assisted Tim in having sex with A.B. on several occasions. She testified that, before each incident, she had pacified A.B. with a Lortab pill. Krystal testified that, when Glenn and Johnny heard about this, they requested permission to have sex with A.B. Krystal related several incidents in which she had helped Glenn and Johnny have sex with A.B.

LAW AND ANALYSIS

I. THE ADMISSION OF A.B.’S VIDEOTAPED HEARSAY STATEMENTS

A. Constitutional principles

¶ 12. The Sixth Amendment to the United States Constitution provides that *4 “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const, amend. VI. “[Ijntroduction of evidence admitted via a hearsay exception does not necessarily foreclose Confrontation Clause scrutiny.” Birkhead v. State, 57 So.3d 1223, 1238 (Miss.2011). The Court applies de novo review to a Confrontation-Clause objection. Id.
¶ 13. In Crawford v. Washington, 541 U.S. 36, 51, 124 S.Ct. 1354, 1363, 158 L.Ed.2d 177 (2004), the United States Supreme Court stated that “the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.” Crawford held that the Confrontation Clause prohibits the admission of out-of-court, “testimonial” hearsay statements against a criminal defendant, unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. Id. at 68, 124 S.Ct. at 1374. “Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.” Id. The Court stated that the term “testimonial” “applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.” Id. at 68, 124 S.Ct. at 1374. The Court indicated that a statement is likely to be determined testimonial if it was made “with an eye toward” using the statement at trial. Id. at 56 n. 7, 124 S.Ct. 1354.
¶ 14. In Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court provided guidance for determinating whether a statement is testimonial. In Davis, the Court was faced with the question of whether a declarant’s statements in response to a law enforcement officer’s questions during a 911 call were testimonial. Id. at 817, 126 S.Ct. at 2270-71. The Court explained that
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and- that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Id. at 822, 126 S.Ct. at 2273-74. The Court found that the statements during the 911 call were nontestimonial because all circumstances objectively indicated that the primary purpose of the interrogation was to enable the police to meet an ongoing emergency. Id. at 828, 126 S.Ct. at 2277. The statements in Davis were not a “weaker substitute” for the witness’s trial testimony. Id.
¶ 15. Subsequently, the Supreme Court established that documents kept in the regular course of business ordinarily are considered nontestimonial and may be admitted pursuant to applicable hearsay rules, unless the regular course of the entity’s business is to compile information for trial. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 2538, 174 L.Ed.2d 314 (2009). Additionally, statements made to health-care providers for the purpose of diagnosis or treatment generally are considered nontestimonial, as are statements made to friends and neighbors. Bullcoming v. New Mexico, — U.S. —, —, 131 S.Ct. 2705, 2722, 180 L.Ed.2d 610 (2011); Giles v. California, 554 U.S. 353, 376, 128 S.Ct. 2678, 2692-93, 171 L.Ed.2d 488 (2008).
*5 ¶ 16. The Supreme Court further clarified the distinction between testimonial and nontestimonial statements in the recent case of Michigan v. Bryant, 562 U.S. 344, 181 S.Ct. 1143, 179 L.Ed.2d 93 (2011). In Bryant, the Court evaluated the statements a gunshot victim made to the police officers who discovered him mortally wounded in a parking lot. Id. at 1150. The victim had provided answers to the officers’s questions of “what had happened, who had shot him, and where the shooting had occurred.” Id. The Court articulated the following rule: ‘When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the ‘primary purpose of the interrogation’ by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.” Id. at 1162. If, after employing this analysis, the court determines that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency, then the statements are nontestimonial and may be admitted pursuant to state rules of evidence. Id. at 1167. But if the primary purpose was “to establish or prove past events potentially relevant to later criminal prosecution,” then the statements are testimonial and may not be admitted unless the witness either testifies, or is deemed unavailable and there was a prior opportunity for cross-examination. Id. at 1157; Crawford, 68,124 S.Ct. at 1374.
¶ 17. The Court emphasized several important factors courts should consider in making this objective evaluation. “[T]he existence of an emergency or the parties’ perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial.” Id. at 1165. But that is simply one factor in making the determination. Id. at 1160. Another factor is the formality or informality of the encounter between the victim and the interrogator. Id. For example, questioning that occurs in a public area, in a disorganized manner, is highly informal and is more likely to be found nontestimonial. than a formal station-house interrogation. Id. Additionally, “the statements and answers of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation.” Id. In fact, “[i]n many instances, the primary purpose of the interrogation will be most accurately ascertained' by looking to the contents of both the questions and the answers.” Id. at 1160-61. “[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals’ statements and actions and the circumstances in which the encounter occurred.” Id. at 1156. The Supreme Court recognized that the primary purpose of the interrogation may be illuminated by both the interrogator’s identity, and “the content and tenor of his questions.” Id. at 1162. Although the Court articulated specific factors, it clarified that courts making the “primary purpose” determination should consult all relevant information. Id. Applying this analysis, the Supreme Court determined that the gunshot victim’s statements were nontestimonial because an objective evaluation of all relevant circumstances indicated that “‘the primary purpose of the interrogation’ was ‘to enable police assistance to meet an ongoing emergency.’ ” Id. at 1167 (quoting Davis, 547 U.S. at 822, 126 S.Ct. at 2266).

B. Mississippi cases

¶ 18. This Court has held in the context of a child sexual-abuse case that “a state *6 ment is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused.” Hobgood v. State of Mississippi, 926 So.2d 847, 852 (Miss.2006). In Hobgood, this Court found that the hearsay statements of a child sexual-abuse victim admitted under the tender-years exception were nontestimonial because the statements had not been made for the purposes of prosecution, but instead to seek medical and psychological treatment. Id. However, the Court held that statements which the child had made to investigating officers were testimonial. Id. In Bishop v. State, 982 So.2d 371, 375 (Miss.2008), the trial court admitted the statements of a child sexual-abuse victim to her mother and her therapist because they were not made- for the purpose of furthering the prosecution, and they were nontestimonial. The trial court excluded as testimonial the child’s hearsay statements to a forensic interviewer because the child had been sent to the forensic interviewer for the purpose of gathering evidence against Bishop. Id. This Court affirmed the trial court’s determination that the child’s statements to the mother and therapist were nontestimonial. Id. Although Hobgood and Bishop were decided before Bryant, they applied an analysis consistent with that approved by the Bryant Court of “objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.” Bryant, 131 S.Ct. at 1162.

C. Confrontation-Clause analysis

¶ 19. It is undisputed that A.B.’s statements were hearsay and that the defendants did not have a prior opportunity to cross-examine her. Therefore, the only question is whether A.B.’s statements in the forensic interview were testimonial. If an objective evaluation of all relevant circumstances indicates that the primary purpose of the forensic interview was to gather evidence to further a criminal prosecution, then the interview was testimonial.
¶ 20. The State does not argue that the primary purpose of the interview was to meet an ongoing emergency, as in Davis and Bryant. Indeed, A.B. was safely in the care of her great-grandmother when she reported sexual abuse. Her grandmother contacted DHS, which began an investigation that day. Considering the question of formality, the forensic interview was highly formal. The interview occurred in a facility specially designed for that purpose. It was conducted according to the RATAC protocol, which Mackey testified is a protocol comprised of questions designed to elicit information from a child to enable the interviewer to conclude whether the interview is consistent with a conclusion that the child has been abused.
¶ 21. However, the formality of an interrogation is not dispositive of whether the primary purpose of the interrogation was to gather evidence for a criminal prosecution. Bryant, 131 S.Ct. at 1160. I turn to “the identity of [the] interrogator, and the content and tenor of h[er] questions.” Id. at 1162. Joiner was a trained forensic interviewer. “Forensic” has been defined as “used or suitable to courts of law.” Black’s Law Dictionary 660 (7th ed.1999). This definition indicates that a “forensic interview” is geared toward gathering information for use in court. As Mackey testified, a forensic interview is a “fact-finding interview.” Indeed, Joiner’s questions focused on eliciting A.B.’s identification of her abusers. Joiner asked A.B. pointed and repeated questions in an apparent effort to determine who had abused A.B., and exactly what acts the perpetrators had committed. In furtherance of this obvious goal, Joiner introduced the *7 name of Glenn, one of the men A.B. had named in her statements to her great-grandmother. The fact that the forensic interview was preserved on videotape and transmitted to law-enforcement officials indicates a prosecutorial purpose. Also, the fact that a separate medical examination of A.B. was performed provides further indication that the purpose of the forensic interview was to gather evidence, and not for medical diagnosis and treatment.
¶ 22. The Court of Appeals found that the forensic interview was nontestimonial because the interview had been administered by a nonprofit entity, Family Crisis Services, and no member of law enforcement had been involved. Jordan, 80 So.3d 817, 828. However, the lack of participation by members of law enforcement does not end the inquiry. The pertinent question is not whether law-enforcement officials were present, but whether, objectively considered, all relevant circumstances indicate that the primary purpose of the forensic interview was “to establish or prove past events potentially relevant to later criminal prosecution.” A.B.’s forensic interview was arranged by DHS as part of its investigation into the abuse allegations. In Davis, the Court recognized that 911 operators “may at least be agents of law enforcement when they conduct interrogations of 911 callers” and the Court “considered] their acts to be acts of the police” for the purpose of its analysis. Davis, 547 U.S. at 823 n.3, 126 S.Ct. at 2274. Shaw, the DHS employee who witnessed the interview, testified that the purpose of the forensic interview was “so that [A.B.] doesn’t have to be interviewed by me and then the same question is asked by the police, and the same question is asked by the D.A.; so that we can all see it on the tape; and she won’t have to be asked more than once.” Shaw’s testimony plainly shows that Family Crisis Services, and its employee, Joiner, were acting as agents of law enforcement in conducting a fact-finding interview of A.B. on behalf of DHS, the police, and the D.A.’s office.
¶ 23. An objective evaluation of all the relevant circumstances indicates that the primary purpose of the forensic interview of A.B. was to establish or prove past events relevant to a criminal prosecution of A.B.’s alleged abusers. The forensic interview was conducted in a formal setting, using a protocol designed to elicit information about past occurrences, and preserved on videotape. Shaw’s testimony established that Family Crisis Services acted as an agent of law enforcement by conducting the interview in order to gather information on behalf of DHS, the police, and the D.A.’s office. An objective evaluation of all relevant circumstances shows that the videotape of A.B.’s forensic interview was intended as a substitute for trial testimony. Because A.B.’s statements in the forensic interview were elicited “with an eye toward use at trial,” I would find they constituted testimonial hearsay and that their admission violated Tim’s, Glenn’s, and Johnny’s right of confrontation as guaranteed by the Sixth Amendment.

D. Harmless-error analysis

¶ 24. Confrontation-Clause violations are subject to harmless-error analysis. Bynum v. State, 929 So.2d 312, 314 (Miss.2006). “A defendant convicted on the basis of constitutionally inadmissible Confrontation Clause evidence is entitled to a new trial unless it was harmless in that ‘there was [no] reasonable possibility that the evidence complained of might have contributed to the conviction.’ ” U.S. v. Jackson, 636 F.3d 687, 697 (5th Cir.2011) (quoting United States v. Alvarado-Valdez, 521 F.3d 337, 341 (5th Cir.2008)); see Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). To affirm despite a Confrontation-Clause viola *8 tion, a reviewing court must find from a consideration of all the evidence that the Confrontation-Clause error was harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).
¶ 25. The physical evidence established that A.B. had been the victim of severe sexual abuse. The prosecution bore the burden to prove beyond a reasonable doubt that the perpetrators of that abuse were Tim, Glenn, and Johnny. Portions of the forensic interview in which A.B. implicated Tim, Glenn, and Johnny were played multiple times for the jury. The interview provided the jury with its only opportunity to observe A.B. and assess her demeanor and credibility. Mackey vouched for the validity of Joiner’s questioning techniques and opined that A.B.’s disclosures in the interview were consistent with those of a child who has been sexually abused. Other than A.B.’s hearsay statements on the videotape, the only evidence establishing the identity of the perpetrators was the testimony of Krystal, and the testimony of A.B.’s grandmother, great-grandmother, and therapist. Krystal testified in exchange for a favorable plea deal and had difficulty testifying due to mental impairment. A.B.’s grandmother, great-grandmother, and therapist testified to isolated statements by A.B. in which A.B. also consistently implicated Larry. The fact that Larry never was charged in connection with A.B.’s allegations casts doubt on A.B.’s credibility.
¶ 26. Without the forensic interview, the amount of highly persuasive evidence that the defendants were the perpetrators would have been considerably diminished. I would find that, considering the evidence against the defendants, the error in admitting the forensic interview was not harmless beyond a reasonable doubt, and the defendants are entitled to a new trial.
II. THE ADMISSION OF AJB.’S MOTHER’S ATTORNEY, CARNELIA FONDREN, UNDER THE HEARSAY EXCLUSION FOR PRIOR CONSISTENT STATEMENTS
¶ 27. When the defense cross-examined Krystal about her plea agreement, she became confused and had difficulty answering the questions. In an effort to rehabilitate Krystal, the State called Krystal’s attorney, Camelia Fondren, as a surprise witness to testify to prior consistent statements Krystal had made during plea negotiations.[5] Over a hearsay objection, the trial court ruled that the statements were admissible under Rule 801(d)(1)(B) to rebut the charge that Krystal had fabricated her testimony in order to get a favorable plea deal.
¶ 28. Fondren testified that she had spent about sixty hours with Krystal during the course of her representation. Fon-dren testified that, although Krystal had maintained her innocence for a year, Fon-dren had suspected that Krystal knew what had happened to A.B., and Fondren approached the State to negotiate a plea deal for Krystal. She testified that, subsequently, Krystal had admitted to her that she had helped each defendant sexually assault A.B., and that based on Krystal’s admissions, Fondren had believed Krystal was justified in pleading guilty.
•¶ 29. Rule 801(d)(1)(B) provides, in relevant part:
A statement is not hearsay if:
... The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with the declarant’s testimony and is offered to rebut an express or implied charge *9 against the declarant of recent fabrication or improper influence or motive....
M.R.E. 801(d)(1)(B). In Tome v. U.S., 518 U.S. 150, 156, 115 S.Ct. 696, 700, 130 L.Ed.2d 574 (1995), the Supreme Court held that a prior consistent statement is admissible under Rule 801(d)(1)(B) only if it was made prior to the time that the motive for fabrication arose. This is because a statement made after a motive to fabricate arose is not relevant to rebut a claim of recent fabrication. Id. This Court applied Tome’s holding in Owens v. State, 666 So.2d 814, 816 (Miss.1995), stating that “a prior consistent statement may not be admitted to refute all forms of impeachment or merely to bolster the witness’s credibility, but only to rebut an alleged motive.” For admissibility, “[t]he consistent statements must have been made before an alleged influence, or motive to fabricate arose.” Id. at 816-17 (citing Tome, 513 U.S. at 156, 115 S.Ct. at 700). Therefore, the timing of the motive to fabricate is key to the admissibility determination. Tome, 513 U.S. at 166, 115 S.Ct. at 705.
¶ 30. The timing of Krystal’s motive to fabricate is diseernable from Fondren’s testimony. Fondren testified that when Krystal was charged, she had denied any knowledge of who had abused A.B. Then, Fondren communicated with the prosecutor about a possible plea deal, and the prosecutor responded that he needed Krystal’s assistance. About a year passed with no plea offer, during which time Krystal maintained her innocence. Then, a plea deal was negotiated in which Krystal admitted to criminal conduct. Fondren specifically testified that, at the time she requested a plea deal from the prosecutor, Krystal had not yet revealed any inculpa-tory information. She testified that she then had asked the prosecutor what kind of deal he could offer, assuming Krystal inculpated the defendants. • Then, Krystal told Fondren that she had assisted Tim, Glenn, and Johnny in sexually assaulting A.B.
¶ 31. I would find that, because Krystal’s admissions to criminal conduct occurred in the course of her plea negotiations with the State, they were made after her motive to fabricate existed, and they were not relevant to rebut the charge of recent fabrication. Krystal’s statements to Fondren were inadmissible under Rule 801(d)(1)(B), and their admission imper-missibly bolstered Krystal’s testimony.

CONCLUSION

¶ 32. Because the videotaped forensic interview of A.B. constituted testimonial hearsay, A.B. did not testify, and the defendants did not have a prior opportunity to cross-examine A.B., the admission of the videotaped forensic interview violated the defendants’ right of confrontation guaranteed by the Sixth Amendment. And considering all the evidence, the Confrontation-Clause violation was not harmless beyond a reasonable doubt. The admission of Fondren’s hearsay testimony was error. This case should be reversed and remanded for a new trial.
KITCHENS, J., JOINS THIS SEPARATE WRITTEN STATEMENT.

. The child’s name has been changed to protect her identity.

. A.B.’s therapist testified A.B. consistently said that “Larry” also had abused her.

. Beccaril testified that, on a later occasion, A.B. had told her that Larry had touched her. No criminal proceedings were instigated against Larry Grose in connection with A.B.

. Krystal Jordan was known variously as Krystal, Kristi, or Christy.

. Krystal waived the attorney-client privilege, permitting Fondren’s testimony.