**REVISED December 14, 2018**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50465

United States Court of Appeals
Fifth Circuit

**FILED**
December 12, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

       Plaintiff – Appellee,

v.

GEORGE LAMAR DARRYL FOSTER,

       Defendant – Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before REAVLEY, ELROD, and HIGGINSON, Circuit Judges.

REAVLEY, Circuit Judge:

George Lamar Darryl Foster was convicted of transporting aliens for commercial advantage or private financial gain. Foster argues that the introduction of videotaped depositions of two material witnesses at trial violated his rights under the Confrontation Clause because the government failed to demonstrate the witnesses were unavailable. We vacate the judgment and remand for new trial.

I.

Driving a tractor-trailer with a refrigerated unit, Foster attempted to cross the Sierra Blanca checkpoint around midnight on July 7, 2016. Border

## No. 17-50465

Patrol agents discovered six persons in the trailer's refrigerated unit, five of whom were undocumented aliens. Two of those aliens were Jose Manuel Francisco-Maldonado and Leandro Hernandez-Ruiz. Everyone relevant to this appeal was arrested. The government charged Foster in a two-count indictment for transporting aliens for commercial advantage or financial gain and conspiracy to do the same.

The government conducted video depositions of Francisco-Maldonado and Hernandez-Ruiz on July 22, 2016. Both identified Foster as the driver of the tractor-trailer. During their depositions, the government advised the witnesses they might be needed for trial and, if so, that the government would allow them to reenter the United States and would pay for their travel expenses. The witnesses were asked to provide an address and telephone number where they could be reached in Mexico. Hernandez-Ruiz provided a home address and a telephone number. Francisco-Maldonado provided a home address and email address. Both testified under oath that they would return for Foster's trial and that they would update their contact information if it changed. In exchange for their testimony, the government agreed to drop all criminal charges against them. Francisco-Maldonado and Hernandez-Ruiz were released from their halfway house that day.[1]

On November 7, 2016, the district court issued an order setting Foster's case for trial.[2] The week before trial, the government filed a motion to declare Francisco-Maldonado and Hernandez-Ruiz unavailable and to allow for the introduction of their videotaped depositions at trial. According to the

---

[1] As the government concedes, it is unclear whether the witnesses "departed the United States pursuant to deportation, removal, or voluntary departure." At oral argument, the government indicated Francisco-Maldonado was probably deported, but was unsure about Hernandez-Ruiz.

[2] The district court initially set Foster's trial date for January 30, 2016, but later reset the trial for February 27, 2017.

government's motion, the agent assigned to Foster's case began attempts to contact Francisco-Maldonado and Hernandez-Ruiz the day after the district court set Foster's case for trial, and continued those efforts through February 14, 2017, the week before Foster's trial. During that four-month period, the government stated that it called Hernandez-Ruiz six times, emailed Francisco-Maldonado four times, sent a letter to the witnesses' home addresses, and made some attempt to reach out to the Mexican government, as well as the witnesses' attorney. The government did not attach any documentary evidence in support of the above-mentioned efforts. A few days prior to trial, the district court granted the government's motion to declare Hernandez-Ruiz and Francisco-Maldonado unavailable.

The trial went as follows: Foster filed a motion to exclude the videotaped depositions on the ground that their introduction would violate his Sixth Amendment right to confrontation because the government failed to demonstrate that the material witnesses were unavailable. Although Foster argued, among other things, that the efforts the government described in its motion were "not reflected on the record . . . in any place," the district court accepted the government's factual representations and denied Foster's motion.

The Border Patrol agents who investigated and arrested Foster testified that Foster attempted to drive the tractor-trailer through the checkpoint and that they discovered six individuals inside the trailer's refrigerated unit, two of whom were Francisco-Maldonado and Hernandez-Ruiz. The Special Agent from the U.S. Department of Homeland Security who interviewed Foster upon his arrest testified that Foster initially denied having knowledge that undocumented aliens were in his truck but eventually confessed to transporting them for money. The agent also testified that Foster gave a written statement to this effect. Next, the government presented Francisco-Maldonado and Hernandez-Ruiz's videotaped depositions, and Foster again

objected on Confrontation Clause grounds. Testifying in his own defense, Foster claimed that he did not know there were individuals in his trailer and that he gave a written statement only after being threatened and coerced by investigators during the interview.

The jury found Foster guilty of transporting aliens for commercial advantage or private financial gain but not guilty on the conspiracy count. The district court sentenced Foster to 57 months of imprisonment, to be followed by 2 years of supervised release. Foster timely filed a notice of appeal.

II.

Foster argues that the district court violated his Sixth Amendment confrontation rights by allowing the use of Hernandez-Ruiz's and Francisco-Maldonado's videotaped depositions in lieu of live testimony. We review Confrontation Clause challenges *de novo,* subject to harmless error review. *United States v. Tirado-Tirado,* 563 F.3d 117, 122 (5th Cir. 2009).[3]

The Confrontation Clause affords criminal defendants the right "to be confronted with the witnesses against him." U.S. CONST. AMEND. VI. The Supreme Court has explained that the Confrontation Clause contemplates

> a personal examination and cross examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Ohio v. Roberts,* 448 U.S. 56, 63–64 (1980) (*overruled on other grounds by Crawford v. Washington,* 541 U.S. 36 (2004)) (quoting *Mattox v. United States,* 156 U.S. 237, 242–43 (1895)). But this right is not absolute. Indeed, "some

---

[3] Foster additionally argues that he had an inadequate prior opportunity to cross examine the witnesses. Because we hold the witnesses were not "unavailable," we do not address this argument.

circumstances justify dispensing with confrontation at trial." *U.S. v. Allie*, 978 F.2d 1401, 1406 (5th Cir. 1992). Out-of-court statements, like a videotaped deposition, "may be introduced against a criminal defendant if the government can 'demonstrate the unavailability of the declarant whose statements it wishes to use.'" *Id.* (quoting *Roberts*, 448 U.S. at 65–66). Our question in this case is whether the government demonstrated that Francisco-Maldonado and Hernandez-Ruiz were "unavailable."

## A.

"A witness is 'unavailable' for Confrontation Clause purposes if the 'prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.'" *Id.* (quoting *Roberts*, 448 U.S. at 74). "The lengths to which the prosecution must go to produce a witness is a question of reasonableness." *Tirado-Tirado*, 563 F.3d at 123 (quoting *Roberts*, 448 U.S. at 74) (ellipsis omitted); *see Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 418 (5th Cir. 1992) ("[D]eposition testimony is admissible only if the government has exhausted reasonable efforts to assure that the witness will attend trial."). Although "[t]he inevitable question of precisely how much effort is required on the part of the government to reach the level of a 'good faith' and 'reasonable' effort eludes absolute resolution applicable to all cases," it is well established that, "[b]ecause of the importance our constitutional tradition attaches to a defendant's right to confrontation, the 'good faith effort' requirement demands much more than a merely perfunctory effort by the government." *Allie*, 978 F.2d at 1406, 1408.

In *Allie*, for example, we held the government satisfied the good-faith test because it: (1) gave the witnesses the option of remaining in the United States with work permits; (2) told the witnesses that it would pay for travel expenses; (3) issued a subpoena, as well as a letter to assist with reentry; (4) prior to deportation, obtained repeated assurances from the witnesses that

they would return; (5) after deportation, remained in contact with the witnesses by calling them several times in Mexico; (6) informed border inspectors of the witnesses' anticipated arrival; and (7) issued checks to be given to the witnesses. *Id.* at 1407. Similarly, in *United States v. Calderon-Lopez*, we found good faith where the government: (1) prior to deportation, issued subpoenas and letters in which apprised the witnesses that they might be required to appear at trial; (2) in the letters, provided "explicit instructions" for gaining reentry; (3) informed the witnesses that it would cover travel-related expenses; (4) provided contact information; and (5) following deportation, made several attempts to contact the witnesses and remained in contact with one witness. 268 F. App'x 279, 289 (5th Cir. 2008) (per curiam).

By contrast, in *Tirado-Tirado*, the government's efforts did not meet the good-faith effort standard. Prior to deportation, the government failed to make any concrete arrangements, only orally informing the witness "in relatively vague and uncertain terms" that his testimony would be required if the case went to trial. 563 F.3d at 124. Further, the government did not serve the witness with a subpoena and "delayed attempting to contact him about making such arrangements until shortly before trial." *Id.* at 123. Only the week before trial did contact attempts commence; the government attempted to reach the witness by phone, letter, contacted the witness's family members, reviewed call logs from the witness's phone at the time of his arrest to identify potential leads, checked immigration and criminal records, and subpoenaed financial records for transactions made in the witness's name. Although we noted these efforts were "fairly exhaustive," we nevertheless concluded the government did not meet its good-faith burden because the efforts "were made at the last minute and followed a long period during which the government apparently made no effort to remain in contact with [the witness]." *Id.* at 125. We reached the same result in *United States v. Guadian-Salazar*, 824 F.2d 344 (5th Cir.

1987). After the government deposed the witnesses in that case, it took them to the Mexican border, served them with subpoenas printed in English only and a notice stating that, if their testimony was needed for trial, the government would "make provisions for [them] to legally enter the United States and to remain until the case is terminated." *Id.* at 346. Although the government's agent provided his contact information and instructed the witnesses to meet him at a specific port of entry on a specific date, the government did not advance the witnesses any travel funds and did not await the witnesses' arrival at the agreed-upon port of entry. *Id.* In that case, we accepted the government's concession that the use of videotaped deposition testimony violated the defendant's right to confrontation. *Id.* at 347.

In this case we hold that the government's efforts to secure the presence of Hernandez-Ruiz and Francisco-Maldonado do not meet the good-faith standard. The government made no attempt to verify or confirm the authenticity or workability of the witnesses' contact information, make any attempt to obtain additional collateral contact information, or offer the option of remaining in the United States pending Foster's trial. Instead, the government merely informed Hernandez-Ruiz and Francisco-Maldonado that their testimony might be needed if Foster's case went to trial and that it would take care of travel arrangements if that turned out to be the case. Most critically, however, after the government released the material witnesses, it failed to remain in contact with them. To be sure, each of the above-mentioned factors standing alone do not demonstrate a lack of good faith or reasonable efforts; rather, it is their aggregation in this case that does.

The government notes that deporting a material witness may nevertheless be consistent with good faith. While this is true, we have emphasized that good-faith "should include efforts aimed at keeping the witnesses in the United States", *Allie*, 978 F.2d at 1407, because that is the

"best way" to ensure a witness's availability for trial. *Tirado-Tirado*, 563 F.3d at 124. After all, "implicit 'in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a witness from becoming absent.'" *Allie*, 978 F.2d at 1407 (quoting *United States v. Mann*, 590 F.2d 361, 368 (1st Cir. 1978)). But we have also refused to adopt a per se rule that deportation of a material witness necessarily results in a lack of good faith. *Tirado-Tirado*, 563 F.3d at 124; *Allie,* 978 F.2d at 1407–08. We make clear that, *if* the government elects to deport a witness, it must undertake other, reasonable measures to ensure the witness returns for trial. The government in this case did not.

As mentioned, the government made no effort to verify the contact information provided by Hernandez-Ruiz and Francisco-Maldonado or to obtain any alternative contact information. When the government releases a material witness to his home country, we think it is only reasonable for the government to attempt to verify beforehand whether the proffered line of communication is valid or workable. Verifying the contact information provided by a material witness in an alien-smuggling case before deporting that witness to his home country (and in exchange for the dismissal of criminal charges) is a crucial step that, if not undertaken, will almost certainly handicap the government's efforts to maintain contact. Doing so takes minimal effort; the failure to do so is unreasonable and demonstrates a lack of good-faith. After all, the United States government is "uniquely capable of taking reasonable measures to insure that the witness will appear at trial." *Ruiz,* 973 F.2d at 419.

But more importantly, the government made no attempt to remain in contact with either witness until the district court set Foster's case for trial. By then, three-and-a-half months had passed. When the government releases or deports a material witness, it must attempt to remain in contact with the

witness. In *Allie*, for example, following the witnesses' return to Mexico, the government "called the witnesses several times to confirm that the witnesses would return as promised and to verify the date, time and place of reentry." 978 F.2d at 1403. In *Calderon-Lopez*, the government "remained in contact with [the witnesses] and requested Significant Public Benefit Paroles in order to facilitate their reentry into the United States." 268 F. App'x at 289. And in *Tirado-Tirado*, where we held the government could not demonstrate unavailability because it made no attempt to contact the witness until the week before trial, we noted that "[b]y contrast, in *Allie* and *Calderon–Lopez,* in which we found that the government took reasonable measures to secure the presence of deported witnesses, the government made efforts to remain in contact with the witnesses following their deportation." 563 F.3d at 124.

The government appears to argue that it need only commence contact efforts upon the setting of a trial date. We disagree. The government's obligation to make good-faith and reasonable efforts to ensure a witness's physical presence at trial exists and demands effectuation until the witness is present or the efforts become futile. The Confrontation Clause's unavailability requirement does not allow for significant gaps in the good-faith continuum: The government must undertake reasonable efforts before deportation, after deportation, during the interim period before a trial date is set, and certainly after the trial date is set. Indeed, the government's failure to shoulder its burden on the front-end, prior to deportation, may confine or impair later efforts. Put differently, if the government skimps on reasonableness and good-faith efforts before deportation, its post-deportation task of securing the witness's presence for trial will become inevitably more difficult. And failing to attempt to remain in contact with a material witness after deportation multiplies the risk the witness will not return for trial; plea negotiations and other issues inherent in criminal litigation may delay the setting of a trial date,

No. 17-50465

thus placing more time and, in turn, doubt, between a witness's promise to return and the likelihood that he will. A witness who is released after receiving vague instructions that he may be required to appear for trial might believe that matters had concluded or that his testimony was no longer necessary. In this case, the failure to make the minimal effort to remain in contact with the witnesses following their release was not reasonable and demonstrates a lack of good faith.

To be sure, some of the government's conduct is indicative of a good-faith and reasonable effort to secure the witnesses' physical presence, such as telling the witnesses that the government would cover travel-related costs and assist with reentry, in addition exchanging contact information. But those efforts do not remedy the harm wrought by releasing the material witnesses to Mexico without first verifying their contact information and then failing to attempt to remain in contact. Nor did the government make any effort to keep the witnesses in the United States or secure the witnesses' "repeated assurances" that they would return (aside from that given in their depositions). This is a case where the government took the depositions of material witnesses, deported them, and then waited several months before making any attempt to reach out. Under these circumstances, the government virtually assured the absence of Hernandez-Ruiz and Francisco-Maldonado. "The right of confrontation may not be dispensed with so lightly." *Barber v. Page*, 390 U.S. 719, 725 (1968).

## B.

We must also note the problems presented by the government's failure to provide evidentiary support for many of the measures it claims to have undertaken. In its motion to declare the material witnesses unavailable, the government represented that it sent emails, letters, made phone calls, and sought help from the Mexican government and the witnesses' attorney. But

10

there is not a shred of evidence documenting these measures: The record contains no copies of the emails, letters, or other correspondence the government purportedly sent, nor is there any catalog of phone records. We have previously questioned the propriety of relying on such representations in the unavailability context. *See United States v. Acosta-Ruiz*, 481 F. App'x 213, 217 n.3 (5th Cir. 2012) (per curiam) ("Although we do not reach the issue of whether the Government can rely on the representations of its attorney to establish its good faith in procuring a witness's testimony for Confrontation Clause purposes, we note that such reliance is extremely disfavored.").

We thus again take the opportunity to question the government's reliance on the unsworn representations of its attorney to establish good faith for purposes of the Confrontation Clause. As noted in *Acosta-Ruiz*, given that our review is *de novo* and the good-faith inquiry is inherently fact-bound and turns on reasonableness, the lack of such documentary evidence presents "great practical difficulties for us as a reviewing court." *Id.* After all, the government's burden is an evidentiary one, so it only makes sense to require the government to produce evidence in support of its efforts. *See Roberts*, 448 U.S. at 74–75 ("As with other evidentiary proponents, the prosecution bears the burden of establishing [unavailability]."). We have eschewed reliance on such unsworn assertions in both the sentencing and speedy-trial contexts. *See United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007) ("The unsworn assertions of the government's attorney do no provide a sufficiently reliable basis for a defendant's sentence."); *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002) ("The Government argued in its opposition that it was diligent, offering reasons for its delay and explaining efforts to track Cardona down, but did not support its memorandum with a single shred of evidence then or at the later hearing. . . . The Government's arguments in brief are not evidence."); *see also Skyline Corp. v. Nat'l Labor Relations Bd.*, 613 F.2d 1328, 1337 (5th Cir.

1980) ("Statements by counsel in briefs are not evidence."). Notwithstanding our grave doubts as to whether the government's unsworn statements are adequate to carry its burden under the Confrontation Clause, we need not answer the question here because the government's pre-deportation shortcomings and its failure to maintain contact with the material witnesses following their release proves fatal to the government's case.

Having determined that the admission of Hernandez-Ruiz and Francisco-Maldonado's videotaped deposition testimony violated Foster's right to confrontation, we next ask whether the error was harmful.

C.

"A defendant convicted on the basis of constitutionally inadmissible Confrontation Clause evidence is entitled to a new trial unless it was harmless in that there 'there was [no] reasonable possibility that the evidence complained of might have contributed to the conviction.'" *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008) (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). "The government bears the burden of establishing the error is harmless beyond a reasonable doubt." *Id.*

The government argues that it meets it burden by pointing to other evidence in the record to support conviction such as the testimony of government agents who were present when Foster attempted to cross the Sierra Blanca checkpoint, as well as Foster's confession. We disagree. In the context of a Confrontation Clause violation that arises from the introduction of inadmissible testimony, "[o]ur focus is on the possibility of harm arising from [Hernandez-Ruiz and Francisco-Maldonado's testimony] and not necessarily on the possibility of its relationship to other evidence." *Id.* In *Alvarado-Valdez,* we concluded that the government's significant reliance on inadmissible testimony during closing argument made it impossible for the court to

12

No. 17-50465

determine if the jury would have convicted based on other testimony or evidence. 521 F.3d at 342–43. We reach the same result here.

Like *Alvarado-Valdez*, the government relied in part on the out-of-court testimony in its closing argument: "Consider the material witnesses, those videotaped interviews and those people saying, Yup, I'm undocumented. I'm not here legally. He was the driver of the vehicle. He waved us into the trailer and we got into the trailer that he was driving." As a result, we "cannot see how the government can conclusively show that the tainted evidence did not contribute to the conviction, because the government's closing argument relied on that very evidence." *Id.* at 342–43. More importantly, the only questions the jury submitted to the court while deliberating concerned Hernandez-Ruiz and Francisco-Maldonado's testimony. Put simply, the government cannot demonstrate beyond a reasonable doubt that the videotaped depositions of the material witnesses did not contribute to Foster's conviction.

## III.

The judgment is VACATED, and this matter is REMANDED for new trial or other proceedings as appropriate. We need not address Foster's asserted error concerning the admission of evidence pursuant to Federal Rule of Evidence 404(b), and we do not comment on the sentence.

No. 17-50465

STEPHEN A. HIGGINSON, Circuit Judge, dissenting:

I share the majority's concern that material witnesses who depart the United States before trial may not return to testify. But, as the majority opinion acknowledges, our cases do not require the government to keep witnesses who are foreign nationals in the country until trial. *See United States v. Tirado-Tirado*, 563 F.3d 117, 124–25 (5th Cir. 2009) ("[D]eporting a witness may still be consistent with 'good faith' and 'reasonable' efforts to procure the witnesses' availability at trial."); *United States v. Allie*, 978 F.2d 1401, 1407 (5th Cir. 1992) (refusing "to adopt a *per se* rule" requiring the government "to coercively detain the witnesses in the United States").

In light of this precedent, I cannot agree that the government failed to engage in *good faith* efforts to ensure these foreign national witnesses' availability for trial. "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Tirado-Tirado*, 563 F.3d at 123 (quotation omitted). Here, Foster had the opportunity to cross-examine each foreign national witness at his deposition. In addition, the government secured each foreign national's assurances, with counsel present and under oath, that (1) he understood his presence at trial might be required; (2) he agreed to travel to Texas for trial; (3) he had provided the case agent with his contact information; (4) he agreed to update his contact information with his attorney or the case agent if it changed; and (5) he understood that the government would arrange for and pay for his travel back to the United States. Such sworn statements, with counsel present, serve as a vital form of verification in our legal system. *See, e.g., Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity.").

Thereafter, the government began its efforts to contact the witnesses as soon as the district court set a trial date, and made multiple attempts to reach

14

each witness.[1] *Cf. Tirado-Tirado*, 563 F.3d at 125 (explaining that the government should have made arrangements with the witness once the trial date was set, "or at least [sought] to contact him more than one week prior to trial"). Although it may be better practice to remain in continuous contact with material witnesses after they leave the country, the three-and-a-half months that elapsed between the witnesses' depositions and the government's first attempts to contact them was not an unreasonably long period of time.

If the foreign national witnesses were willing to return to the United States to testify, the government's efforts were reasonably calculated to communicate the importance of their testimony and to ensure their presence at trial. If the foreign national witnesses were not willing to return for trial, I am not convinced that taking additional steps to verify their contact information or to reach out to them earlier would have made a difference.

In *United States v. Calderon-Lopez*, 268 F. App'x 279 (5th Cir. 2008), we held that the government made reasonable efforts to secure the presence of four material witnesses at trial even though the witnesses were deported. *Id.* at 282, 289. As the majority opinion emphasizes, the government in that case was able to remain in contact with two of the witnesses. *Id.* at 289. But the government lost contact with the other two witnesses whose video depositions were played at trial. *Id.* at 283–84, 289. Further, unlike in this case, the government does not appear to have secured the witnesses' explicit assurances that they would return for trial. *Id.*; *cf. Allie*, 978 F.2d at 1407 (noting that the government got the witnesses' assurances that they would return to testify). Again, the witnesses here not only made assurances that they would return,

---

[1] As the majority opinion observes, the only evidence in the record of the government's efforts to contact the witnesses in Mexico comes from the representations of counsel. But Foster did not argue in his brief that these representations are inaccurate or that the district court erred in accepting the government's representations without requiring further documentary evidence.

but they did so under oath and with counsel present. The majority and I may disagree about whether securing sworn assurances is more or less likely to ensure a witness's presence at trial than attempting to remain in continuous contact with the witness after deportation. But this disagreement does not render the government's approach in this case unreasonable.

Although "[o]ne, in hindsight, may always think of other things" that *could* have been done, and perhaps should have been done, the government must demonstrate only that its efforts satisfied its duty of good faith. *Ohio v. Roberts*, 448 U.S. 56, 75–76 (1980), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004); *see also United States v. Aguilar-Tamayo*, 300 F.3d 562, 566 (5th Cir. 2002) ("We do not suggest that it is necessary for the government to take all of the steps referenced in *Allie* to establish that it acted reasonably to secure a witness' presence."). The district court concluded that it was "satisfied that the Government has made every effort that they can to get these witnesses here, believe me." Because I see no reversible error in this conclusion, I respectfully dissent.