# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50294

United States Court of Appeals
Fifth Circuit

**FILED**

January 16, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ARTURO SARLI, also known as Jose B. Sanchez, also known as Billy Sarli, also known as Arturo Sarly, also known as Armadillo Sarly,

Defendant - Appellant

Appeals from the United States District Court for the
Western District of Texas

Before HAYNES, HO, and DUNCAN, Circuit Judges.

JAMES C. HO, Circuit Judge:

Following a tip from a confidential source, Arturo Sarli was arrested and convicted for possession with intent to distribute methamphetamine. He challenges his conviction under the Fourth and Sixth Amendments. We unanimously deny Sarli's Fourth Amendment claim, on the ground that he consented to the search of his vehicle. But we are divided with respect to Sarli's claim that, due to certain statements made at trial in violation of the Confrontation Clause, he is entitled to a new trial.

During trial, both the prosecutor and a prosecution witness referred to certain out-of-court statements by a confidential source. Sarli contends these

No. 17-50294

references violated the Confrontation Clause because he did not get to cross-examine the source. By a divided vote, we hold that these references were harmless.

To be sure, the confidential source placed Sarli at the scene of the crime—providing Sarli's name, identifying his vehicle, and alleging he would be transporting methamphetamine to a particular location on a particular date. But so did the officers who pursued the tip and caught Sarli red-handed. They testified in court that they personally saw Sarli at that very location, on that very day, transporting methamphetamine in that very vehicle. So any references to out-of-court statements from the confidential source were entirely redundant of the testimony of the officers who caught Sarli at the scene.

Moreover, Sarli's defense at trial wasn't that he didn't do it—it was that he didn't *know* what he was doing. Sarli admitted he agreed to be paid to transport a box of cat litter from a Walmart parking lot to a restaurant parking lot. He simply denied knowing that the cat litter contained methamphetamine. Naturally, the prosecution ridiculed Sarli's dubious story as implausible in the extreme (and as evidence of guilt, as our precedents permit). The officers at the scene also testified that, once they found the drugs, Sarli cried about not wanting to go to prison, and protested his wife's innocence.

In sum, the prosecution proved that Sarli knew he was carrying drugs, based not on statements from the confidential source, but on statements from Sarli himself and the various in-court witnesses who testified at trial. So any reference to the confidential source was harmless. There is no reasonable possibility that those references contributed to the conviction. We affirm.

I.

In June 2014, a confidential source told Detective Steven Contreras of the San Antonio Police Department that a man named Arturo was using a white Avalanche pickup truck to transport methamphetamine around San

2

Antonio.  About a month later, that same confidential source told Detective Contreras that Arturo would be transporting about two kilograms of methamphetamine that very day, to the parking lot of Bill Miller's restaurant in San Antonio.

Officers established surveillance and saw a white Avalanche pickup truck.  They checked the license plate of the truck and found it was registered to Arturo Sarli, who had a pending municipal arrest warrant.  When a marked police unit entered the parking lot, Sarli appeared nervous and drove away.  Other officers, including Officer Juan Torres, followed Sarli and initiated a stop after witnessing a traffic violation.  Sarli appeared shaky in the presence of the officers.

Officer Torres asked if Sarli would consent to a search of the truck.  Sarli agreed.  Officer Torres then waited until other officers were free to assist him, before again requesting and obtaining consent to search.  Before beginning the search, officers told Sarli that he was under arrest on the outstanding warrant, handcuffed him, and placed him in the back of a police car.

Officer Torres and others then began the search.  The initial search was unsuccessful.  About 15 minutes after the stop, the first of two police dogs arrived to conduct a "sniff" of the truck.  Neither dog alerted.  Within five minutes of the second dog beginning to sniff, Detectives Contreras and Robert Tamez arrived at the scene.  Soon thereafter, Detective Tamez looked inside of a box of cat litter in the back of the truck and found several small bundles that were later determined to contain methamphetamine.  From beginning to end, the entire search lasted roughly 51 minutes.

Upon discovery of the drugs, Sarli began to cry.  He told the officers that he was scared of going to prison.  He also told them that his wife was innocent.

After he was advised of his rights, Sarli confessed that he drove to a Wal-Mart parking lot to meet an unknown man who gave him the box of cat litter—

and that he agreed to be paid for transporting that box of cat litter to another unknown man he would meet at the restaurant.

Sarli was indicted for possession with intent to distribute 50 grams or more of methamphetamine under 21 U.S.C. § 841(a)(1) and 21 U.S.C. § (b)(1)(A). He moved to suppress the methamphetamine and his statements to police as the products of an unlawful search. After a suppression hearing, the magistrate judge recommended that the motion to suppress be denied. The magistrate judge found that the officers had probable cause to search Sarli's vehicle at the time of the traffic stop, but that the probable cause had dissipated by the time of Detective Tamez's search. The magistrate judge nevertheless found that Sarli had validly consented to the search, that he had not limited the scope of his consent, and that Detective Tamez's search of the cat litter box was valid.

Both parties filed objections to the magistrate judge's report. The district court agreed that the stop of Sarli's vehicle was supported by reasonable suspicion, that the outstanding warrant justified his arrest, and that the truck was subject to impoundment under police policy. It also found that the officers initially had probable cause to search the truck, but that the probable cause had dissipated by the time Detectives Contreras and Tamez arrived. However, the district court agreed that Sarli validly consented to the search, that Detective Tamez's search did not exceed the scope of his consent, and that Sarli had not objected to the continued search or tried to revoke his consent.

Sarli proceeded to trial. At trial, Detective Contreras testified that, when a marked police unit first entered the parking lot, Sarli behaved nervously and quickly drove away. Officer Torres testified that, following his traffic stop, Sarli appeared shaky. Detective Contreras presented unchallenged testimony that Sarli confessed that he agreed to be paid to deliver the package of cat litter from one person to another. Furthermore,

No. 17-50294

Detective Contreras testified that the methamphetamine seized from Sarli's truck was the second largest quantity of methamphetamine he had ever handled.

When Detective Contreras was asked to describe how the investigation "came about"—namely, the tip from the confidential source—Sarli objected on Confrontation Clause grounds. The prosecutor rephrased the question, and Sarli again objected but was overruled. Detective Contreras testified that he received information from the confidential source that a "Hispanic man by the name of Arturo [was] driving a white Avalanche that's going to be delivering narcotics."

During closing arguments, Sarli's counsel argued that Sarli was unaware of the methamphetamine, and that police made various mistakes. The government stated that Sarli was not randomly stopped, that the investigation originated with the tip from the confidential source, and that the allegations in the tip were corroborated by the evidence obtained from the stop and search of Sarli's vehicle. Sarli objected to the prosecutor's reference to the confidential source but was again overruled.

The jury convicted Sarli, and he received a prison sentence of 324 months.

## II.

Sarli raises two issues on appeal. First, he challenges the denial of his motion to suppress the evidence seized from Detective Tamez's search of his vehicle. Second, he challenges the denial of his objections that the two references during trial to the tip from the confidential source violated the Confrontation Clause. We address each in turn.

## A.

"When reviewing a denial of a motion to suppress evidence, this Court reviews factual findings for clear error and the ultimate constitutionality of

law enforcement action *de novo.*" *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014). A district court's denial of a motion to suppress should be upheld "if there is any reasonable view of the evidence to support it." *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc). This Court must "view the evidence in the light most favorable to the party that prevailed below." *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010).

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness"—what a reasonable person would have understood by the exchange between the officer and the suspect. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (collecting cases). Officer Torres did not qualify or limit his request for Sarli's consent, and "an affirmative response to a general request is evidence of general consent to search." *United States v. Garcia*, 604 F.3d 186, 190 (5th Cir. 2010). Where there is ambiguity regarding the scope of a consent, the defendant has the responsibility to affirmatively limit its scope. *See United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003). Sarli placed no such limits.

For his part, Sarli claims that he was unable to observe the search as it was being executed, because he was physically placed in a patrol car shortly after he gave consent. But we have rejected the notion that a consensual search ceases to be valid simply because the accused is unable to observe the conduct of the search. *See, e.g.*, *United States v. Rich*, 992 F.2d 502, 507 (5th Cir. 1993) ("Even if Rich was unable to see what was going on, . . . we are unwilling to . . . hold . . . that enforcement officials must conduct all searches in plain view of the suspect"); *id.* ("The fact that the search was not conducted in a manner that made it conducive or even possible for Rich to later withdraw or limit his consent does not automatically make that search violative of the Fourth Amendment.").

No. 17-50294

In addition, Sarli claims that his consent reached its "natural end" before Detective Tamez's search, citing *United States v. Escamilla*, 852 F.3d 474, 485 (5th Cir. 2017).  But in *Escamilla*, there was a four-hour delay between two disparate searches.  *Id.*  Here, by contrast, the entire search lasted less than an hour, and the police maintained continuous control over the truck to allow various officers and sniffing dogs to conduct overlapping searches during that time.  In short, there was no identifiable "natural end" to Sarli's consent.  *Id.*

Accordingly, the district court properly denied Sarli's motion to suppress the evidence seized from Detective Tamez's search of Sarli's vehicle.

B.

At trial, Sarli objected on Confrontation Clause grounds at two different junctures:   (1) when the prosecutor asked Detective Contreras how the investigation of Sarli had "come about," and (2) when the prosecutor referenced in closing argument that the San Antonio Police Department investigation "started" with the tip from the confidential source.  Both objections were overruled.

We assume without deciding that the references to the confidential source's tip violated the Confrontation Clause.  We nevertheless affirm because we are convinced that the error was "harmless beyond a reasonable doubt." *United States v. Jimenez*, 464 F.3d 555, 562 (5th Cir. 2006) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

For a verdict to survive a Confrontation Clause violation, there must be "'[no] reasonable possibility that the evidence complained of might have contributed to the conviction.'"  *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).  This is a demanding but not insurmountable burden.  *See, e.g., United States v. Bedoy*, 827 F.3d 495, 512 (5th Cir. 2016) (concluding that the error was harmless beyond a reasonable doubt); *United States v. Akins*, 746 F.3d

No. 17-50294

590, 600 (5th Cir. 2014) (finding the testimony cumulative and therefore harmless); *United States v. Ogba*, 526 F.3d 214, 229–30 (5th Cir. 2008) (finding the error harmless in light of the non-hearsay evidence presented at trial); *United States v. Pryor*, 483 F.3d 309, 312 (5th Cir. 2007) (observing that the admitted statement did not undercut Pryor's only defense).

We conclude that there is no reasonable possibility that the information from the confidential informant contributed to Sarli's conviction. That is for one simple reason: The prosecution's case turned on statements made by in-court witnesses and not on any out-of-court statement.

1.

To begin with, the government did not need any out-of-court statement to connect Sarli to the crime scene or to his illicit cargo. The police caught him at the scene, driving the vehicle while the methamphetamine was stored inside. And they testified at trial accordingly. Officers observed Sarli operate a white Avalanche, pull into the Bill Miller's parking lot, act nervously, flee at the sight of a marked patrol car, and then consent to a search of his vehicle, which is where the drugs were discovered. The information provided by the confidential source—the driver's name, vehicle description, location, and the vehicle's content—was entirely redundant in light of the officers' testimony. Indeed, Sarli did not dispute that he drove a white Avalanche to Bill Miller while carrying methamphetamine.

By contrast, in cases where we've granted relief, the defendant's involvement was hotly contested, and the prosecution depended on out-of-court testimony to identify the defendant as a participant in the crime. For example, in *United States v. Kizzee*, 877 F.3d 650 (5th Cir. 2017), a police search of the defendant's house and person yielded less than a gram of crack cocaine. *Id.* at 654–56. It was only thanks to out-of-court statements from Carl Brown that the Government could establish Kizzee as a drug dealer, rather than a mere

8

possessor. "No other testimony was presented to connect Kizzee to Brown as the source of Brown's drugs." *Id.* at 662. In *United States v. Jackson*, 636 F.3d 687 (5th Cir. 2011), the prosecution relied on a set of notebooks, deemed to be out-of-court statements, which the Government candidly contended "amount[ed] to 'proof beyond a reasonable doubt' that Jackson participated in the conspiracy." *Id.* at 697. In *Alvarado-Valdez*, 521 F.3d at 342, the government relied heavily on out-of-court testimony to link the defendant to a cocaine delivery that law enforcement had intercepted one year earlier. The defendant was only arrested after being named by a coconspirator.

### 2.

Sarli did not dispute that he carried drugs—but he did dispute that he *knew* he was carrying drugs. But here again, the government did not need any out-of-court statement to establish its case.

Sarli confessed that he agreed to be paid for the admittedly unusual task of transporting a box of cat litter from one person in a Walmart parking lot to another person at a restaurant. He simply claims that he had no idea he was being paid to transport methamphetamine, rather than cat litter. As we have repeatedly stated, an "'implausible account provides persuasive circumstantial evidence of the defendant's consciousness of guilt.'" *United States v. Lopez-Monzon*, 850 F.3d 202, 208 (5th Cir. 2017) (quoting *United States v. Diaz-Carreon*, 915 F.2d 951, 953–54 (5th Cir. 1990)). A rational jury may infer from "'[a]n implausible account of exculpatory events . . . that the defendant desires to obscure his criminal responsibility.'" *Id.*

So the dubiousness of Sarli's explanation is affirmative evidence of his knowledge under our precedents. And the fact that the box contained a large quantity of methamphetamine, worth at least forty thousand dollars, is further "indicative of intent to distribute." *United States v. Villarreal*, 324 F.3d 319, 325 (5th Cir. 2003).

No. 17-50294

In sum, the prosecution furnished the jury with ample, compelling evidence that Sarli in fact knew he was carrying drugs—all of it independent of the confidential source.  The prosecution essentially pointed to Sarli's own account of what happened and asked the jury to draw the only reasonable inference available.

What's more, the prosecution also called multiple in-court witnesses who testified about Sarli's demeanor and conduct during the investigation.  For example, when a marked police unit first entered the parking lot, Sarli behaved nervously and quickly drove away.  Following his traffic stop, Sarli appeared shaky.  We have held that such "[n]ervous behavior . . . frequently constitutes persuasive evidence of guilty knowledge." *Lopez-Monzon*, 850 F.3d at 209.   Sarli also began to openly weep after police uncovered the methamphetamine, telling officers that he was scared about the prospect of going to prison.  He also told them that his wife was innocent.

Sarli's knowledge is thus amply established by his own statements as well as his behavior at the scene of the crime, as described by various in-court witnesses.  By contrast, nothing in the information provided by the confidential source established that Sarli *knew* he was transporting methamphetamine.  The confidential source stated that police would find drugs in a particular car driven by a particular person—he did not convey whether or not the driver was actually aware he was transporting drugs.  *See, e.g., Unites States v. Wilson*, 657 F.2d 755, 760 (5th Cir. Unit A Sept. 1981) ("That an informant had given a tip that people in the area were in possession of heroin does not add significantly to the evidence of possession.").  Unless the government attempts to insinuate more at trial—and it did not do so here—the information from the confidential source was therefore harmless.

This case thus stands in stark contrast to other cases in which we've granted relief after the prosecution used out-of-court statements to rebut

No. 17-50294

denials of knowledge and other defense theories. For example, in *United States v. Tirado-Tirado*, 563 F.3d 117 (5th Cir. 2009), Customs and Border Protection apprehended the defendant while helping a foreign national enter the United States illegally. The defendant claimed he had no knowledge of his passenger's unlawful status. *Id. at* 120. To prove otherwise, the government argued that the defendant lied to border patrol agents and met his passenger at a designated location. A challenged deposition was the lone piece of evidence backing each point. *Id.* at 126. In *United States v. Foster*, 910 F.3d 813 (5th Cir. 2018), the government presented out-of-court statements during its case-in-chief and its closing argument for the very purpose of proving that the defendant knew he was transporting aliens in his tractor trailer across the border. *Id.* at 816. The jury submitted questions to the court during its deliberations about the out-of-court statements. *Id.* at 822. The court knew with near certainty that the information had at least some impact. In *United States v. Duron-Caldera*, 737 F.3d 988 (5th Cir. 2013), the government introduced into evidence a 40-year-old affidavit from the defendant's maternal grandmother, which it used to disprove the defendant's claim that he had derived U.S. citizenship through his mother. The defendant was being prosecuted for illegal reentry after deportation. *Id.* at 996. His claim of derived citizenship was his sole defense.

3.

This case involves only a small number of fleeting references to out-of-court statements by the confidential informant.

The prosecution mentioned the confidential source's tip only briefly in its opening statement. The entire reference takes up a single sentence. And it is used merely to construct a timeline of events. The dissenting opinion belabors the fact that "the prosecutor featured [the informant's tip] as the *first* point in her opening statement." Dis. Op. at 4. But that is simply because the tip from

the confidential source triggered the investigation. Any chronology of events naturally starts at the beginning, with the event that prompted the police to set up surveillance. Notably though, the prosecution never drew a connection between the confidential information and Sarli's knowledge that he was carrying drugs.

It should be telling, then, that Sarli himself did not object to the prosecution's opening statement at trial. Nor did he bother to brief it on appeal.

Likewise, Detective Contreras never tried to use the confidential informant to prove Sarli's knowledge. He mentioned the confidential informant only when asked how the investigation came about, and what he and the other officers were looking for when they arrived at the restaurant.

Finally, the prosecution mentioned the informant's tip briefly during closing argument. And once again, when it came to the core dispute over Sarli's knowledge, the prosecution focused on Sarli's own statements: "when we come to the end, what he's telling you is that he had that box to deliver to someone at Bill Millers. How can one not knowingly know what that is. And to be financially compensated for it. Who is going to be financially compensated for delivering a Tidy Cats box. Of course you're going to be compensated because you know there's drugs in there. He's part of it."

To overturn a conviction based on mere fleeting references to out-of-court statements would be tantamount to establishing a rule of *per se* harm. Our precedents, by contrast, require not just speculation, but a "reasonable possibility" that the error contributed to the conviction. Meeting that standard requires far more than this case involves. *See, e.g.*, *United States v. London*, __ F. App'x __, 2018 WL 3933753, at *5 (5th Cir. Aug, 15, 2018) (evidence underscored multiple times throughout trial); *Alvarado-Valdez*, 521 F.3d at 342 ("insistent reliance" during closing argument).

No. 17-50294

4.

Understandably, the dissenting opinion resists the notion that it is applying a standard of *per se* harm. But consider the proposed theory of harm.

At bottom, the dissenting opinion focuses on a single sentence from the prosecution's rebuttal closing argument to establish a connection between the confidential informant and proving Sarli knew he was carrying drugs: "[t]hose factors all go to knowledge and the intent to distribute." Based on this one sentence, the dissenting opinion makes this observation: "Evidently, the prosecutor believed the tip's implicating Sarli was one 'factor' proving his knowledge and invited the jury to draw that inference." Dis. Op. at 6.

But not once did the prosecutor ever explain to the jury how the tip could possibly help to prove knowledge. To the contrary, the prosecution made clear that it was Sarli's own statements—namely, his dubious cat litter defense—that proved his knowledge. By contrast, nothing in the confidential tip established whether Sarli was a knowing participant or an ignorant, gullible mule—and the prosecutor did not once suggest otherwise.

If we are going to undertake the dramatic step of setting aside a jury verdict and ordering a new trial, we should require more than speculation about what the prosecution might have privately believed. We should require, for example, an actual statement to the jury, explaining how one could reasonably conclude that the tip tends to prove Sarli's knowledge and thereby contributes to his conviction. It is undisputed that no such statement was ever made here.

Our harmless error precedents require a "reasonable possibility" of taint—not worst case scenarios about what an irrational runaway jury might have done on its own, notwithstanding the arguments actually made by the prosecution. The judgment is affirmed.

No. 17-50294

STUART KYLE DUNCAN, Circuit Judge, dissenting in part:

I join Part II.A of the majority opinion, which correctly affirms the denial of Sarli's motion to suppress on Fourth Amendment grounds. I respectfully dissent from Part II.B, however, because I would find that admission of the detective's testimony about the confidential informant's tip (1) violated the Confrontation Clause and (2) was not harmless error.

I.

Because I disagree with the majority opinion's harmless error analysis, *see infra*, I must first address the prior question of whether admission of the challenged testimony violated the Confrontation Clause. It did.

As the majority recounts, Detective Contreras was allowed to testify he received a tip from a confidential informant that "there was a male Hispanic man by the name of Arturo driving a white Avalanche that's [*sic*] going to be delivering narcotics." Contreras further explained that, according to the tip, "Arturo" would deliver the drugs to a specific location ("a Bill Millers" in "the area of Probandt and Highway 90"). Based on that tip, surveillance was established that led to Sarli's arrest. Sarli's attorney objected repeatedly to Contreras's testimony on Confrontation Clause grounds but was overruled.

Admission of Contreras's testimony violated the Confrontation Clause because it allowed a police officer to recount an inculpatory testimonial statement by a non-testifying witness whom Sarli never had the chance to cross-examine. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004); *see also, e.g., United States v. Kizzee*, 877 F.3d 650 (5th Cir. 2017) (explaining that "police testimony about the content of statements given to them by witnesses are testimonial under *Crawford*," and that "officers cannot refer to the substance of statements made by a nontestifying witness when they inculpate the defendant") (and collecting decisions). Several sister circuits have correctly

14

held that admission of a confidential informant's inculpatory statement under these circumstances implicates the Confrontation Clause. *See, e.g., United States v. Shores*, 700 F.3d 366, 374 (8th Cir. 2012) (explaining that "[a] [confidential informant's] statement clearly falls within the type of out-of-court statement categorized as 'testimonial'" for Confrontation Clause purposes); *United States v. Lopez-Medina,* 596 F.3d 716, 730 (10th Cir. 2010) (same); *United States v. Cromer,* 389 F.3d 662, 675 (6th Cir. 2004) (explaining that "statements of a confidential informant are testimonial" for Confrontation Clause purposes because "[t]ips provided by confidential informants are knowingly and purposely made to authorities, accuse someone of a crime, and often are used against the accused at trial"); *see also* 2A WRIGHT, MILLER & MARCUS, FED. PRAC. & PROC. § 412 ("[S]tatements by a confidential informant . . . are 'testimonial' and therefore subject to exclusion under the Confrontation Clause.").

To be sure, the Confrontation Clause is not implicated when out-of-court statements are offered, not for the truth they assert, but for other purposes—such as to "provide context for [an] investigation or explain 'background' facts," especially "where a defendant challenges the adequacy of an investigation." *Kizzee*, 877 F.3d at 659 (citing *United States v. Smith*, 822 F.3d 755, 761 (5th Cir. 2016); *United States v. Carrillo*, 20 F.3d 617, 619 (5th Cir. 1994); *United States v. Castro–Fonseca*, 423 F. App'x 351, 353 (5th Cir. 2011)). The government invokes that exception here, claiming testimony about the tip was needed to rebut Sarli's argument that the officers made "rookie mistakes." But Contreras could have explained the circumstances leading to Sarli's arrest without divulging the details from the tip (*i.e.*, Sarli's first name, his ethnicity, his sex, the car he was driving, and the fact that he would be "delivering narcotics" to a specific location). What we have previously said about such statements applies here: "Statements exceeding the limited need to explain an

No. 17-50294

officer's actions can violate the Sixth Amendment," particularly "where a nontestifying witness specifically links a defendant to the crime[.]" *Kizzee*, 877 F.3d at 659–60 (citations omitted).

In sum, I would find that admission of Detective Contreras's testimony about the confidential informant's out-of-court statements violated the Confrontation Clause.

## II.

The majority opinion recites the correct harmless error standard for cases where evidence is introduced in violation of the Confrontation Clause: "[T]here must be '[no] reasonable possibility that the evidence complained of might have contributed to the conviction.'" Maj. Op. at 7 (quoting *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008)).[1] But the majority concludes the government has met this admittedly "demanding" burden "[f]or one simple reason: The prosecution's case turned on statements made by in-court witnesses and not on any out-of-court statement." Maj. Op. at 8. I respectfully disagree.

First, the majority opinion underestimates how important the inadmissible testimony was to the government's case. The majority states there was "only a small number of fleeting references to out-of-court statements by the confidential informant." *Id.* at 12. That is mistaken. Far from making "fleeting references" to the tip, the prosecutor featured it as the

---

[1] *See also, e.g., United States v. Tirado-Tirado*, 563 F.3d 117, 126 (5th Cir. 2009) (asking whether government can prove "there is no reasonable possibility that the improperly admitted evidence might have contributed to the conviction"); *United States v. Jackson*, 636 F.3d 687, 697 (5th Cir. 2011) (asking whether "'the government can conclusively show that the tainted evidence did not contribute to the conviction'") (quoting *Alvarado-Valdez*, 521 F.3d at 342–43); *Kizzee*, 877 F.3d at 661 (same); *United States v. Foster*, 910 F.3d 813, 821 (5th Cir. 2018) (same) (citing *Alvarado-Valdez*, *supra*).

*first* point in her opening statement. Immediately after greeting the jury, the prosecutor stated:

> This is a very simple case. *It occurs when Detective Contreras received information that an individual named Sarli, driving a white Avalanche, was distributing methamphetamine.*

And the prosecutor returned to the tip in her rebuttal closing:

> The case started as a narcotics investigation. *Detective Contreras received information from a confidential informant. Based on that information*, what he did was look for an Avalanche, a white Avalanche, which is a vehicle that the person transporting to deliver [*sic*] the drugs was operating. He identified the person as Arturo.

It is no answer that these references merely established a "chronology of events." Maj. Op. at 12. As already explained, the prosecutor could have easily established what triggered the investigation in purely generic terms (*i.e.*, "This all started because of a tip that led the police to surveil and arrest Sarli."). But the prosecutor did far more: she divulged details from "a nontestifying witness [that] specifically link[ed] [Sarli] to the crime," *Kizzee*, 877 F.3d at 659–60 (brackets added), in both opening and closing statements.

  We have consistently refused to find harmless error where the prosecutor emphasized the inadmissible testimony in closing argument. *See Alvarado-Valdez*, 521 F.3d at 342 (given "government's insistent reliance on the [challenged] testimony in its closing argument, . . . we cannot say the [Confrontation Clause] error was harmless"); *Tirado-Tirado*, 563 F.3d at 126 (in light of government's "emphasis" in closing argument on tainted testimony, finding "reasonable possibility that [testimony] might have contributed to [defendant's] conviction"); *Jackson*, 636 F.3d at 697 (government put "great importance" on tainted evidence "[i]n both its case in chief and its closing argument" and therefore cannot "conclusively show" evidence did not contribute to conviction); *see also, e.g., Foster*, 910 F.3d at 821–22 (explaining

17

that "*Alvarado-Valdez* . . . concluded that the government's significant reliance on inadmissible testimony during closing argument made it impossible for the court to determine if the jury would have convicted based on other testimony or evidence") (citing *Alvarado-Valdez*, 521 F.3d at 342–43); *Kizzee*, 877 F.3d at 662 ("The importance of [challenged] testimony to the prosecution's case can be underscored if it is referenced in closing statements."). This case falls squarely in line with those precedents: indeed, here the government emphasized the inadmissible testimony in opening *and* closing.[2] As a result, I "cannot see how the government can conclusively show that the tainted evidence did not contribute to [Sarli's] conviction, because the government's [opening and] closing argument[s] relied on that very evidence." *Alvarado-Valdez*, 521 F.3d at 342–43.

Second, the majority opinion incorrectly asserts that "the prosecution never drew a connection between the confidential information and Sarli's knowledge that he was carrying drugs." Maj. Op. at 12. To the contrary, in her rebuttal closing the prosecutor (1) brought up the tip ("Detective Contreras received information from a confidential informant."); (2) recounted the inculpatory details ("He identified the person as Arturo. It was to happen on Probandt at the Bill Millers . . . a place . . . notorious for drug dealers"); (3) described Sarli's stop as "consistent with what's been told to the detective before"; and (4) concluded that "[t]hose factors *all go to knowledge* and the intent to distribute[.]" (emphasis added). Evidently, the prosecutor believed the tip's implicating Sarli was one "factor" proving his knowledge and invited the jury to draw that inference. That explains why she raised the point in

---

[2] That is why finding harm here would not "establish[ ] a rule of *per se* harm," as the majority opinion claims. Maj. Op. at 12. Had the prosecutor avoided mentioning the tainted testimony in her opening and closing arguments, the government would have an easier time meeting its harmless error burden.

rebutting the defense's closing argument that "Sarli didn't know that was drugs, and they didn't show it." I thus disagree with the majority that the prosecutor did not "attempt[ ] to insinuate" that the tip established Sarli's knowledge. Maj. Op. at 11. Moreover, it is speculative to assert, as the majority opinion does, that "nothing in the information provided by the confidential source established that Sarli *knew* he was transporting methamphetamine."*Id.* at 10. The detective testified the informant told him about "a male Hispanic man by the name of Arturo driving a white Avalanche that's [*sic*] going to be delivering narcotics." From that testimony, the jury could have readily inferred Sarli knew he was carrying narcotics. At a minimum, there is a "reasonable possibility" that the out-of-court statement "might have contributed" to Sarli's conviction, meaning the government cannot show harmless error. *Alvarado-Valdez*, 521 F.3d at 341.

Third, the majority opinion points to in-court testimony separate from the inadmissible testimony from which the jury could have inferred Sarli's knowledge. *See* Maj. Op. at 9–10 (discussing (1) Sarli's admission he was paid "for the admittedly unusual task of transporting a box of cat litter"; (2) the large quantity of meth; (3) testimony about Sarli's nervous behavior; and (4) testimony that Sarli began "weeping," said he was afraid of going to prison, and claimed his wife was "innocent"). But the majority asks the wrong question. The question is not whether there was sufficient *untainted* evidence to convict Sarli, but whether the government "demonstrate[d] beyond a reasonable doubt that the *tainted* evidence did not contribute to [Sarli's] conviction." *Alvarado-Valdez*, 521 F.3d at 342 (emphasis and brackets added).[3]

---

[3] *See, e.g., Rhodes v. Dittmann*, 903 F.3d 646, 665–66 (7th Cir. 2018), *reh'g denied* (Oct. 10, 2018) (explaining that harmless error review "is not the same as a review for whether there was sufficient evidence at trial to support a verdict"); *see also Foster*, 910 F.3d at 821 (explaining that, in the Confrontation Clause context, "'[o]ur focus is on the possibility of

No. 17-50294

Our precedents have rejected this "mere sufficiency-of-the-*untainted*-evidence analysis" in Confrontation Clause cases. *Lowery v. Collins*, 988 F.2d 1364, 1373 (5th Cir. 1993). For instance, in *Alvarado-Valdez*—after noting that the prosecution relied on the tainted evidence in its closing—we explained that "[t]here is no way to determine whether the jury would have convicted [the defendant] purely on the basis of [someone else's] testimony or of any of the other evidence," because doing so "would require retrying the case on appeal, at best, or engaging in pure speculation, at worst." *Id.* at 343.[4]

The majority opinion insists that the prosecution "did not need" the substance of the confidential informant's tip to connect Sarli to the crime and that the jury had ample evidence to convict Sarli "independent of" the detective's illicit testimony about the tip. Maj. Op. at 8, 9, 10. Whether or not that is true, it is precisely the kind of analysis our precedents instruct us *not* to undertake in assessing harm from introduction of testimony in violation of the Confrontation Clause. Instead, "the reviewing court must concentrate on the evidence that violated [the defendant's] confrontation right, not the sufficiency of the evidence remaining after excision of the tainted evidence." *Lowery*, 988 F.2d at 1373.

---

harm arising from [the tainted testimony] and not necessarily on the possibility of its relationship to other evidence'") (quoting *Alvarado-Valdez*, 521 F.3d at 342) (brackets added).

[4] *See also Foster*, 910 F.3d at 821–22 (rejecting government's argument "that it meets it[s] [harmless error] burden by pointing to other evidence in the record to support conviction"); *Kizzee*, 877 F.3d at 662 ("While other circumstantial evidence implicated [defendant] and corroborated [the inadmissible] out-of-court statements, we find this evidence is insufficient to show harmless error beyond a reasonable doubt."); *Jackson*, 636 F.3d at 697 (concluding government cannot show harmless error "[i]n light of [its] reliance on tainted evidence, and notwithstanding the other evidence implicating [defendant] in the conspiracy").

In sum, I would find that the Confrontation Clause violation was not harmless and that Sarli is therefore entitled to a new trial.

I respectfully dissent.