IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

F I L E D

March 12, 2008

Charles R. Fulbruge III
Clerk

No. 99-40370

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

VICENTE ALVARADO-VALDEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas
No. 5:98-CR-608-2

Before HIGGINBOTHAM, DAVIS, and SMITH, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

In 1998, Vicente Alvarado-Valdez , Ricardo Flores, Pablo Santos Chapa, and Julian Medrano were indicted for conspiracy to possess with intent to distribute more than five kilograms of cocaine. Alvarado-Valdez and Chapa were charged in a second count with aiding and abetting possession with intent to distribute more than five kilograms of cocaine. Chapa pleaded guilty. Alvarado-Valdez, Flores, and Medrano were convicted by a jury as charged. We affirmed

the convictions of Medrano and Flores. United States v. Flores, No. 99-40367, 281 F.3d 1279 (table), 2001 WL 1692443 (5th Cir. Nov. 26, 2001) (per curiam). We erroneously dismissed Alvarado-Valdez's appeal for want of prosecution and have reinstated it. In light of Crawford v. Washington, 541 U.S. 36 (2004), we vacate and remand for a new trial.

I.

On July 17, 1997, Border Patrol agents stopped a tractor-trailer owned by Zenon Cantu and driven by Eleazar Eggers near Laredo, Texas. Federal officials found approximately 1,436 kilograms of powdered cocaine inside.

Cantu surrendered the next morning to agents of the Drug Enforcement Administration, and federal agents conducted a warranted search of his house, seizing telephone and address books, ledgers, and other documents. Eggers and Cantu were indicted for conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). Cantu pleaded guilty pursuant to a plea agreement.

More than a year later, Alvarado-Valdez and Chapa was arrested by federal officials, and two days later Flores and Medrano were arrested. On July 21, 1998, the government obtained an indictment charging that (i) Alvarado-Valdez and the three co-defendants (Chapa, Medrano, and Flores) had conspired and agreed to possess with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) in June and July 1997; and (ii) Alvarado-Valdez and Chapa had possessed with intent to distribute approximately 1,436.2 kilograms of cocaine in violation of the same provision.

Chapa entered into a plea agreement in September 1998, pleading guilty only to Count One of the indictment. Alvarado-Valdez, Medrano, and Flores were convicted by a jury.

## II.

## A.

The government's evidence against Alvarado-Valdez consisted of (i) testimony by Cantu and Chapa about a conspiracy to transport cocaine in June and July 1997, (ii) telephone records showing calls from Cantu and Chapa to Alvarado-Valdez during those months, and (iii) evidence about an alleged 1996 marihuana transaction involving Cantu and Alvarado-Valdez. Cantu testified at trial. Before trial, Chapa fled to Mexico, and the government was unable to locate him. The government had Officer Garcia read portions of Chapa's interrogation into evidence over the objection of Alvarado-Valdez's counsel.

### 1.

As the government acknowledges, it relied primarily on the testimony of Cantu, who owned a trucking business in Laredo. He testified to overseeing the transportation of fifty loads of narcotics, of which he personally drove thirty-five.

Cantu testified that Chapa recruited Alvarado-Valdez, who in turn recruited Cantu, who said he had known Alvarado-Valdez for about fifteen months before June 1997, when the first shipment of cocaine was transported. Cantu claimed Alvarado-Valdez approached him in May 1997 to transport a load of marihuana but that nothing came of that deal. Alvarado-Valdez then proposed Cantu transport cocaine at a rate of $300 per kilogram in June. Cantu recruited Medrano, Flores, and Eggers to drive the tractor-trailers.

Medrano and Flores drove the first load. Cantu testified he and Flores picked up 840 kilograms of cocaine from Alvarado-Valdez's house. To the contrary, however, Cantu also testified that he never saw cocaine at Alvarado-Valdez's house, from which Flores drove the cocaine to Cantu's house.

Medrano and Flores successfully transported the cocaine from Laredo to

Port Washington, New York.[1] While there, Medrano called Cantu and told him that David Gomez, also known as "Chongo," their contact person, had not arrived, though they had called him numerous times. Cantu said he informed Alvarado-Valdez of this problem.

Thereafter, Medrano and Flores reported that Chongo had retrieved the trailer. Cantu claims he received $202,000 from Alvarado-Valdez on June 18, which he in turn gave to Medrano and Flores in exchange for a fee of $20,000.

For the second load, which was expected to be approximately 1,145 kilograms, Cantu met Alvarado-Valdez and Chapa in early July. This time Chapa was in possession of the cocaine. Cantu could not hire Medrano and Flores again, so he turned to Eggers.

Cantu and his son drove to a mall to meet a van with the cocaine. The van was driven by the same man who had delivered the cocaine the previous month. Alvarado-Valdez told Cantu the truck belonged to him even though it was registered to Chapa. Cantu drove the cocaine to his home and noticed that it had branding similar to the June shipment, indicating that they came from the same source.

Eggers met with Chapa, Alvarado-Valdez, Cantu, and a long-haired stranger, Chongo, to whom the cocaine was to be delivered. Alvarado-Valdez gave Cantu, who in turn gave Eggers, Chongo's cellular phone and pager numbers.

Cantu acquired legitimate bills of lading from Flores's business, Panamex, claiming the trailer would be loaded with furniture. Eggers took possession of the trailer on July 17. After Eggers departed, Cantu testified that he notified Alvarado-Valdez. Eggers, driving the trailer, was arrested that day at the Border Patrol checkpoint. He was in possession of Cantu's loaned cell phone, the

---

[1] Medrano and Flores testified to only transporting a load of furniture to Port Washington. Cantu testified that he would disguise cocaine shipments as furniture shipments.

one used by Medrano on the previous trip. Agents seized 1,436.2 kilograms of cocaine.

Cantu had followed Eggers to the checkpoint and saw all this. He testified to driving to Alvarado-Valdez's house immediately to inform him.

Eggers implicated Cantu and Chapa but not Alvarado-Valdez. Chapa fled to Mexico. The following day, Chapa called Alvarado-Valdez and suggested Cantu and Alvarado-Valdez rendezvous with him in Mexico. Alvarado-Valdez feared repercussions from superiors if he went to Mexico. Cantu turned himself in on the advice of counsel.

## 2.

Because Chapa had fled to Mexico, the government called Garcia to testify as to what Chapa had told him in interrogation. Garcia stated the following over objection of counsel:

> Mr. Chapa stated that in early May 1997, Chapa was introduced to Francisco Paco; that is, Paco, by a friend of Chapa identified as Juan. Chapa stated that Francisco Paco propositioned Chapa to transport approximately 800 kilograms estimated by gross weight of cocaine from Laredo Texas to Port Washington, New York. Chapa added that Chapa was to getting [sic] paid $350 per kilograms of cocaine that Chapa transported. Chapa stated that due to financial reasons Chapa agreed, advising Francisco Paco that Chapa would need to find a driver that could get a legitimate load as a cover load to Port Washington, New York.
>
> ⁎⁎⁎
>
> Chapa stated that approximately one week later, after the first load of cocaine was delivered, Chapa was once again propositioned by Francisco Paco while in Laredo, Tamaulipas, Mexico to transport 1,[4]36.2 kilograms estimated gross weight of cocaine, which was seizedSSor were seized on 07-17-97.
>
> ⁎⁎⁎

Chapa also stated that during this period of time Chapa was under constant pressure from PacoSSor Francisco, excuse me, Paco to have the cocaine delivered. Chapa would constantly call Cantu and pressure Cantu into finding a driver to deliver the cocaine.

B.

The government introduced other evidence, though it admits to relying primarily on the above testimony. Authorities obtained a search warrant for Cantu's and Chapa's properties; there was no search of Alvarado-Valdez's residence. Agents seized telephone and address books, ledgers, documents, communication devices, radios, and cellular phones from Cantu's property. The search also uncovered a yellow notebook with notations indicative of drug activity. The phone numbers of other conspirators were found. Though the government says it found two documents bearing Alvarado-Valdez's name, the record is inconclusive. The search of Chapa's residence uncovered various phone numbers of the co-conspirators but not Alvarado-Valdez's.

The phone records indicate a flurry of calls among the conspirators, including to and from numbers allegedly belonging to Alvarado-Valdez, around the time of the two deliveries. Alvarado-Valdez contends that one of the numbers attributed to him, which was in his son's name, was not his. Panamex organized deliveries to Port Washington on the dates alleged, but Medrano and Flores admitted to at least making furniture deliveries.

III.

Alvarado-Valdez claims his Sixth Amendment Confrontation Clause right was violated by the introduction of Chapa's testimony. We review Confrontation Clause objections de novo, subject to harmless error analysis. United States v. Jimenez, 464 F.3d 555, 558 (5th Cir. 2006). Both sides agree that Alvarado-Valdez properly objected to the subject testimony and preserved the issue for de novo review.

Crawford, 541 U.S. at 68, instituted a categorical rule barring the admission of out-of-court testimonial statements against the accused absent opportunity for cross-examination. The bar applies "irrespective of whether the statement falls within a firmly rooted exception or bears particularized guarantees of trustworthiness." United States v. Holmes, 406 F.3d 337, 348 (5th Cir. 2005). Chapa's testimony is within the rule, because Crawford applies at a minimum "to police interrogations." Crawford, 541 U.S. at 68.

Nor is there any question that the testimony was offered to prove the matter asserted and therefore was hearsay. See FED. R. EVID. 801; Holmes, 406 F.3d at 349. Chapa's testimony was offered to prove that he and Alvarado-Valdez conspired with the others to transport cocaine in June and July 1997. Though the parties agree a constitutional violation occurred,[2] they disagree what burden the government must meet to establish harmless error.

## A.

A defendant convicted on the basis of constitutionally inadmissible Confrontation Clause evidence is entitled to a new trial unless it was harmless in that there "'there was [no] reasonable possibility that the evidence complained of might have contributed to the conviction.'" Chapman v. California , 386 U.S. 18, 24 (1967) (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963)). The government bears the burden of establishing the error is harmless beyond a reasonable doubt. United States v. Akpan, 407 F.3d 360, 377 (5th Cir. 2005).

The government argues that it can meet its burden by pointing to other evidence in the record to support conviction. For this, the government wholly relies on United States v. Rodriguez-Martinez, 480 F.3d 303 (5th Cir. 2007), in which we said,

---

[2] In fairness to the district court, we recognize that Crawford had not been decided when this case was tried.

> To determine whether the Confrontation Clause error was harmless, "[t]he correct inquiry is whether, assuming that the damaging potential of cross-examination were fully realized, a reviewing court might nonetheless say the error was harmless beyond a reasonable doubt." We consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

Rodriguez-Martinez, 480 F.3d at 308 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)).

In contrast, Alvarado-Valdez claims the error cannot be harmless if it might have contributed to the verdict, even taking account of the other evidence. Alvarado-Valdez relies on Lowery v. Collins, 988 F.2d 1364, 1373 (5th Cir. 1993), in which we said the inquiry is whether there is "no reasonable possibility that the tainted evidence might have contributed to the jury's verdict of guilt."

Van Arsdall did not announce a new harmless-error standard for Confrontation Clause violations. The Court explicitly relied on Chapman for the proposition that Confrontation Clause violations are subject to harmless error analysis. Van Arsdall, 475 U.S. at 684. Nevertheless, how the government must meet its burden of proof is based on what kind of violation is involved.

In Van Arsdall, the Court was concerned with Confrontation Clause violations arising from the denial of a defendant's right to impeach a witness for bias. See Van Arsdall, 475 U.S. at 684. The Court's particular test makes sense in light of that specific Confrontation Clause violation: To determine whether a defendant was harmed by not being able to impeach a witness, it is necessary to look at what the full exercise of cross-examination could have disclosed. In Lowery, however, the Confrontation Clause violation involved the admission of a videotaped deposition of a six-year-old victim of molestation. See Lowery, 988 F.2d

at 1366.

In the context of the instant Confrontation Clause violation, the latter approach is correct. Between Confrontation Clause violations that arise in the context of the impeachment of a witness for bias and those involving the very introduction of inadmissible testimony, the right announced in Crawford is closer to the latter. Accordingly, the government must demonstrate beyond a reasonable doubt that the tainted evidence did not contribute to the conviction.

## B.

Ultimately, this case turns on the way in which the government must meet its burden by showing that other evidence in the record demonstrates that the error in admitting Chapa's testimony was harmless beyond a reasonable doubt. Our focus is on the possibility of harm arising from Chapa's testimony and not necessarily on the possibility of its relationship to other evidence.

Our task would be difficult were it not for the government's insistent reliance on the testimony in its closing argument, in light of which we cannot say the error was harmless. In that argument, the government said,

> [L]et's consider the statement of Cantu and Chapa without reference to [Alvarado-Valdez, Medrano, and Flores]. Okay? What did Mr Cantu tell you? Well, he told you that in the early part of June he was approached by Chapa and was asked to find transportation to move 840 kilos of cocaine. Let's look at what Mr. Chapa told you. Mr. Chapa, you heard, at the time of his arrest said, as Agent Garcia said, "Sometime in early may of 1997 I was introduce [sic] to a man named Paco by my friend Palacios Cantu, and Paco asked me to help move some 800 kilos of cocaine." What else did he tell Agent Garcia? "Well, after the first load of cocaine was successfully delivered to New York, I was again approached by Paco a week later." Okay. Let's take that just in and of itself. Forget everything else about [Alvarado-Valdez, Medrano, and Flores].

In other words, the government relied on the similarity of Chapa's and Cantu's testimony to prove the conspiracy and, by implication, Alvarado-Valdez's

9

participation in it.  We cannot see how the government can conclusively show that the tainted evidence did not contribute to the conviction, because the government's closing argument relied on that very evidence.  There is no way to determine whether the jury would have convicted Alvarado-Valdez purely on the basis of Cantu's testimony or of any of the other evidence.  That would require retrying the case on appeal, at best, or engaging in pure speculation, at worst.

The judgment is VACATED, and this matter is REMANDED for new trial or other proceedings as appropriate.  We need not address the asserted error in admission of evidence pursuant to Federal Rule of Evidence 404(b), and we do not comment on the sentence.