# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 12, 2022

Lyle W. Cayce
Clerk

No. 21-50122

United States of America,

*Plaintiff—Appellee*,

*versus*

Kenneth Hamann,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
No. 7:20-CR-187

Before Smith, Costa, and Wilson, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

A Texas jury convicted Kenneth Hamann of conspiring to possess methamphetamine ("meth") with intent to distribute. But that jury heard evidence that included the testimonial hearsay of two nontestifying witnesses. Introducing that evidence flouted Hamann's right to confront the witnesses against him. So we vacate his conviction and remand.

Today's decision marks no sea change in our Confrontation Clause jurisprudence. In the last fifteen years, we have vacated at least six convictions

No. 21-50122

and affirmed at least two writs of habeas corpus for kindred reasons.[1] The most recent of those cases was decided just a year before Hamann's trial. There, we reaffirmed what we had said many times: If the government elects to introduce out-of-court statements to attempt to provide context for its investigation, its use must be "circumspect" and "limited." *Jones*, 930 F.3d at 377 (quotation omitted). Trial courts must be "vigilant in preventing . . . abuse" to avoid "the backdoor introduction of highly inculpatory statements." *Id.* (quotations omitted). We reaffirm those principles today.

But we are concerned that the government has repeatedly failed to take the lesson. So let us be unequivocal: It is not "circumspect" to introduce a statement accusing the defendant of selling "multiple ounces" of meth. Nor is it "limited" to give a play-by-play account of the defendant selling meth to a confidential informant. If those uses have any probative value in explaining why police began an investigation, they "pale in comparison to the risk that the jury will consider [the statements for their] truth." *Sharp*, 6 F.4th at 582. The Confrontation Clause commands that testimonial evidence be tested "in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61 (2004). Although we decline, once again, to sanction an exception that would swallow that rule, we remind prosecutors to take note.

---

[1] *See United States v. Jones*, 930 F.3d 366, 375–81 (5th Cir. 2019); *United States v. Foster*, 753 F. App'x 307, 310–15 (5th Cir. 2018); *United States v. Kizzee*, 877 F.3d 650, 656–63 (5th Cir. 2017); *United States v. Duron-Caldera*, 737 F.3d 988, 992–97 (5th Cir. 2013); *Jones v. Cain*, 600 F.3d 527, 536–41 (5th Cir. 2010) (habeas); *United States v. Tirado-Tirado*, 563 F.3d 117, 122–25 (5th Cir. 2009); *Taylor v. Cain*, 545 F.3d 327, 334–37 (5th Cir. 2008) (habeas); *United States v. Alvarado-Valdez*, 521 F.3d 337, 341–43 (5th Cir. 2008); *see also United States v. Sharp*, 6 F.4th 573, 581–83 (5th Cir. 2021) (holding that the Confrontation Clause was violated but finding no plain error where the defendant had failed to raise the issue before the district court), *cert. denied*, 142 S. Ct. 1124 (2022).

No. 21-50122

## I.
## A.

A grand jury indicted Hamann for conspiracy to "possess with the intent to distribute and [conspiracy to] distribute" meth "[f]rom on or about January 1, 2020[,] through on or about February 25, 2020." That indictment alleged two prior "serious drug felon[ies]" intended to establish Hamann's eligibility for a sentence enhancement for career offenders. Those prior felonies happened on two occasions. The first included three inchoate offenses—attempt to make meth, aiding and abetting the possession of illegal chemicals and equipment, and aiding and abetting the maintenance of a meth lab. The second occasion was a conviction for possession of meth with intent to distribute.

Hamann stood trial on the conspiracy charge. The jury heard from seven government witnesses—four investigators, two DEA chemists, and Hamann's alleged co-conspirator, William Davis. Of those witnesses, the most relevant to this appeal is Officer Malcolm Stanley, an investigator for the Midland District Attorney's Office. But we will recount some of the testimony from other witnesses because it is relevant to determining whether any Confrontation Clause error was harmless.

The prosecutor began his opening statement by explaining that police were trying to execute a search warrant for a motel room in Odessa when they found Hamann standing outside with Davis. The prosecutor went on to describe the police's finding roughly 17 grams of meth inside a truck near Hamann and about 150 more grams inside Davis's backpack. He said that Davis agreed to sell Hamann meth after meeting him while both men were staying at the motel.

Then the prosecutor backtracked. He told the jurors, "the evidence you're going to hear is not going to be confined solely to that because

obviously there have to be events leading up to the search warrant that caused the DEA to even be looking at Mr. Hamann." Those events, he said, included a "controlled purchase," where a confidential source bought meth using government money to establish probable cause for the search warrant.

Stanley was the government's first witness, and he picked up where the prosecutor left off. He explained that his primary role in the investigation had been to "cultivate" a relationship with the confidential source (confidential informant (or "CI") or confidential source ("CS")) who did the controlled purchase. He confirmed that the DEA had "conduct[ed] a controlled purchase from Kenneth Hamann" in early 2020.

Stanley purported to explain how the DEA became interested in Hamann. He described a confidential source who had "proven reliable for the DEA in the past." According to Stanley, that source told him that someone nicknamed "Cali" was "moving multiple ounces" of meth. Immediately after that statement, he explained that other local law enforcement agencies knew that "Cali" was Hamann. He also said that those other agencies had heard, from an unknown declarant, that Hamann "was selling narcotics."

Stanley proceeded to recount the controlled purchase that justified the search warrant. The first part of that testimony was ordinary. He told the jury that the investigators thought Hamann was selling drugs from a motel. He recounted how he prepared the source for the transaction by meeting her in a parking lot a mile from the motel, giving her cash with recorded serial numbers, and fitting her with an audio recorder.[2] After that, he sent the source to the motel to buy meth from Hamann.

But then Stanley's testimony veered off course again. He wasn't at

---

[2] The audio recorder malfunctioned, so there is no objective record of what happened during the controlled purchase.

the motel, nor could he see it, as he explained to the jury. Instead, another officer—one who never testified—was watching the motel parking lot and describing what was happening to the other officers over the radio. That fact didn't stop Stanley from describing what the source did when she arrived at the hotel, which Stanley could only have known from the statements of the other officer and the source.

Stanley gave the jurors the following details: When the source arrived at the motel, Hamann came out of a room and met her in the parking lot. The two spoke briefly, then Hamann retreated to his room. The source got out of her car, went into the same room, and remained there for "five to ten minutes." Meanwhile, several other people entered and exited the room. Then the source left and met the officers back where they had prepped her.

Stanley said the source gave the officers meth—but less than the officers had instructed her to buy—and some unspent cash. The police decided they had enough evidence to get a search warrant. That decision ended Stanley's involvement, since he was merely the "CI handler" and didn't participate in serving the search warrant.

The remaining three police witnesses filled in the rest of the story. The day after the controlled purchase, officers tried to execute the warrant. Two officers intended to drive past the motel to make sure it was safe for the remaining officers to show up. But those officers noticed Hamann standing in the parking lot, so they audibled. The officers pulled into the parking lot, parked, walked toward Hamann, and identified themselves. Hamann stood near the passenger side of a truck. Another man crouched nearby, working on a motorcycle. The officers thought the men were together. When Hamann noticed the officers, he reached furtively into the truck.

Police identified the second man as William Davis. They noticed a backpack resting on the motorcycle. Police asked Davis what was in the bag.

No. 21-50122

Davis eventually admitted that it contained meth and a pistol and consented to police's searching the bag. Police found meth and a pistol in the bag. Then they searched the truck that Hamann had reached into and found a much smaller amount of meth than was in Davis's bag.

More officers arrived to search Hamann's motel room, the original object of the search warrant. Those officers didn't find more meth, but they did find marihuana and a pipe.

Police interviewed Hamann in the motel parking lot. Portions of that recording were played to the jury.[3] In that interview, Hamann waived his rights to silence and counsel. At first, Hamann tried to portray himself as a mere meth user. But the police hinted that they knew better and alluded to the controlled purchase. Hamann replied, "Man, you guys are good." Then he conceded that he had sold the confidential source meth the day before. He also admitted to selling some meth the prior summer that he had gotten from two distributors unrelated to Davis or this case.

Davis testified next. He told the jury that he had met Hamann only about a week before the men were arrested but that he was too often intoxicated around that time to remember precisely when. Davis said that he met Hamann because both men were staying at the motel and that Hamann asked to buy meth after he noticed Davis selling it to other people. Davis reported selling Hamann two ounces in total—one ounce a few days before the men were arrested and one ounce the day of that arrest. Davis told the jury that Hamann was probably buying too much meth to use personally.

After that, the two DEA chemists testified to authenticate exhibits

---

[3] Neither the recording of the interview nor a transcription of it is in the record. This account is drawn from references in the live testimony and the closing statements to the interview and the recording.

showing that the substances attributable to Hamann were high-purity meth.

That brings us to the government's closing argument, which referenced the controlled buy more than once. The prosecutor's second sentence was, "[Police] had a confidential informant, the confidential source, the CS that you heard about." He went on to describe the source's purchasing meth from Hamann. He returned to that subject a few minutes later and reminded the jury of the officers' procedure for "cultivat[ing]" confidential sources. And he repeated the story of the controlled purchase after announcing that he was going to demonstrate that he had "proved this case beyond a reasonable doubt."

The jury convicted Hamann of conspiring with Davis to possess meth with intent to distribute. The district court then transitioned to the penalty phase of the bifurcated proceedings. Hamann pleaded "not true" to the indictment's allegations that he had been convicted of two prior serious drug felonies. After hearing the testimony of Hamann's former probation officer, the jury found that Hamann had been convicted of those offenses.

During sentencing, the district court adopted the presentence report, which recommended finding that Hamann's criminal history category was VI and that his offense level was 37, a calculation that included a career-offender enhancement. Under that calculation, the Sentencing Guidelines recommended a sentencing range of 360 months to life. The court assigned 360 months.

## B.

Hamann appeals that judgment of conviction and sentence on two grounds. *First*, he says that Stanley's testimony, by incorporating the statements of nontestifying witnesses, violated his right to "be confronted with the witnesses against him." U.S. CONST. amend. VI. *Second*, he says he was ineligible for the career-offender sentence enhancement because some of

his predicate offenses were inchoate crimes, which he maintains are excluded from consideration by the Guidelines' text.  Hamann presented both of those challenges to the district court.

Hamann first raised the Confrontation Clause objection in a motion *in limine*.  He asked the court to "exclude from trial any reference to the statements of other individuals."  The court granted that motion "in its entirety."

But questions about that motion's scope lingered.  Even by the time of trial, the court hadn't decided, for instance, the extent to which evidence regarding an earlier controlled purchase from Hamann was admissible.  During the pretrial conference, the prosecutor asked the court whether he could reference some of Hamann's prior statements.  The court replied, "As long as you have a good faith belief that that's coming in."

So the parties continued to dispute the admissibility of hearsay evidence during the trial.  When Stanley related the confidential source's statement that "Cali was moving multiple ounces" of meth, Hamann objected on hearsay and Confrontation Clause grounds.  The prosecutor replied that the source's statement was "not being offered for its truth" but merely to explain "the steps [the officers] took in [their] investigation."  The court overruled the objection.

The court sustained other, similar objections.  It prevented Stanley from telling the jury what the source told him about why she didn't buy as much meth from Hamann as they had planned.  And it didn't allow him to provide his understanding of why the source returned some of the money, either.  But generally, the court permitted Stanley to describe in detail the investigation that led to the search warrant, even though it relied on out-of-court statements of nontestifying witnesses, on the theory that those statements were not offered "to prove the truth of the matter asserted."

During the penalty phase, Hamann also objected to the career-

offender enhancement.  He said the court couldn't count his convictions for inchoate offenses as predicate crimes.  The court overruled the objection because it understood it to be foreclosed by *United States v. Lightbourn*, 115 F.3d 291, 293 (5th Cir. 1997).

## II.

We consider Hamann's challenges *de novo* because he timely presented them to the trial court.  *Alvarado-Valdez*, 521 F.3d at 341; *United States v. Cortez-Gonzalez*, 929 F.3d 200, 203 (5th Cir. 2019).

## A.

We ask three questions to determine whether admitted evidence violated the Confrontation Clause:  *First*, did the evidence introduce a testimonial statement by a nontestifying witness?  *Second*, was any such statement offered to prove the truth of the matter asserted?  *Third*, was the nontestifying witness available to testify, *or* was the defendant deprived of an opportunity to cross-examine him?  If the answer to each of those questions is "yes," the Confrontation Clause was violated.  *Kizzee*, 877 F.3d at 656–61.  If the Confrontation Clause was violated, we determine whether the conviction should be vacated by asking whether the government has proven that the error was harmless.  *Alvarado-Valdez*, 521 F.3d at 341.

## 1.

When police officers testify about the contents of witnesses' statements during an investigation, they risk introducing testimonial hearsay evidence.  "A statement is testimonial if its 'primary purpose is to establish or prove past events potentially relevant to later criminal prosecution.'"  *Kizzee*, 877 F.3d at 656 (quoting *Duron-Caldera*, 737 F.3d at 992–93) (alterations adopted).  When a witness's statements at trial implicate a nontestifying declarant's statements, the content is testimonial if it "lead[s] to the clear and

logical inference" that the declarant believed that the defendant committed the charged offense. *Id.* at 658.

Hamann challenges Stanley's testimony under those principles. We separately analyze two aspects of Stanley's testimony. The first concerns his statements that the source told him that "Cali was moving multiple ounces" of meth and that local police had heard from an unknown declarant that Hamann was dealing drugs. The second aspect pertains to Stanley's description of the controlled purchase.

On the first aspect, the government has two responses. It first points out that the tip "did not directly identify" Hamann because it used the nickname "Cali." It also says the "jury could link 'Cali' to the defendant only by evaluating the testimony of an available witness"—Stanley. Our decisions in *Jones* and *Kizzee* foreclosed those rebuttals.

It does not matter that the declarant used the name "Cali" instead of "Hamann" because Stanley and the prosecutor "eliminated all doubt" about whom the informant referred to. *Jones*, 930 F.3d at 377 (quotation omitted). The jury scarcely needed to "infer[ ]" anything. *Kizzee*, 877 F.3d at 658. Stanley introduced the source's statement in response to the question, "Why was the DEA looking to conduct a controlled purchase from the defendant, Mr. Hamann?" After the court overruled Hamann's objection, the prosecutor replied, "So you had information that the defendant Hamann was moving methamphetamine, correct?" Then Stanley explained that he spoke to other local police—more nontestifying declarants—who "immediately knew" that Cali was Hamann and told Stanley that "they had received information"—from still more nontestifying declarants—that Hamann was dealing drugs.

That context "blatantly linked" Hamann to the drug sales. *Jones*, 930 F.3d at 377 (quotation omitted and alteration adopted). The government cannot pretend that it did not spoon-feed Cali's identity to the jury.

Nor is it relevant that Stanley, a testifying witness, linked Cali and Hamann. That was also true in *Kizzee*, 877 F.3d at 657–58, and *Jones*, 930 F.3d at 376–77. To avoid introducing testimonial evidence by implication, Stanley needed to stick to matters within his personal knowledge. But he didn't do that. He and the prosecutor demonstrated that the confidential source and other police officers believed that Cali/Hamann was dealing meth. In doing so, they introduced testimonial evidence from those non-testifying witnesses.

The same is true of Stanley's account of the controlled purchase. The government says Stanley's testimony on that point "consisted only of his observations of the confidential source's actions." And it maintains that Hamann cannot point to an identifiable statement by a nontestifying declarant in Stanley's testimony. The first contention inaccurately describes Stanley's testimony, and the second contention is irrelevant.

It's true that if Stanley *had* provided only his own observations, there would be no Confrontation Clause problem. But Stanley was unequivocal: He "didn't personally have eyes on the hotel" where the controlled purchase happened. Instead, he listened by radio to another officer describing what was happening and debriefed the source after the sale. A man who listened to a Dodgers game on the radio and spoke to a friend who attended the game doesn't have personal knowledge of the game's winner; Vin Scully and the friend do. That man couldn't testify about the game without relying on the accuracy of third parties' observations, and neither could Stanley testify about the controlled purchase without doing the same.

The question is not whether Hamann can identify a particular statement made by a nontestifying declarant, but whether the officer's testimony "allows a fact-finder to infer the statements made to him." *Kizzee*, 877 F.3d at 657. That inference is undeniable here because Stanley described the

controlled purchase in detail despite admitting to the jury that he had not witnessed it personally. Stanley described Hamann's behavior precisely, including where he was before the source arrived, what he did once she got his attention, where he went with her, how long he remained in the room with her, and with whom else he or she may have interacted during that time. If he were testifying from personal knowledge, all he could have said is that he gave the source money and instructions to buy meth from Hamann and that she returned with less meth than expected and change.

So Stanley's statements created the "clear and logical inference that out-of-court declarants believed and said that [Hamann] was guilty of the crime charged." *Kizzee*, 877 F.3d at 657 (quotation omitted and alterations adopted). That's true even though the statements directly implicated Hamann only in the possession and sale of meth, while he was charged with conspiracy, a crime with different elements.[4]

A clear and logical implication can exist without direct proof of each element of the offense. The possession and sale of lots of meth strongly suggests participation in a drug conspiracy. Indeed, that was the government's own theory of the case. In his closing argument, the prosecutor told the jury, "As soon as [Hamann] buys a distributable amount [of meth] from William Davis, there is an agreement. There is . . . a conspiracy." Accordingly, Stanley's testimony implied that nontestifying declarants believed that Hamann was part of a drug conspiracy.

Both challenged aspects of Stanley's testimony—his accounts of the

---

[4] "To prove conspiracy to possess and distribute a controlled substance, the government must show beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate narcotics laws; (2) the defendant's knowledge of the agreement; and (3) his voluntary participation in the conspiracy." *United States v. Valdez*, 453 F.3d 252, 256–57 (5th Cir. 2006).

statements attributing prior meth sales to Hamann and his description of the controlled purchase—were testimonial. So we proceed to ask whether they were offered to prove the truth of the matters asserted.

2.

Evidence can be relevant for multiple purposes. Ordinarily, when evidence is admissible for one purpose but not for another, the court may admit it but must instruct the jury not to consider it for an improper purpose if the opposing party requests the instruction.[5] Under the guise of explaining why police began their investigation or conducted it a certain way, the government from time to time has tried to exploit the concept of multiple relevancies to introduce evidence highly probative of guilt. *See Sharp*, 6 F.4th at 582; *Jones*, 930 F.3d at 377; *Kizzee*, 877 F.3d at 659. For instance, the government might respond to an objection to a police officer's statement, "Bubbles—a confidential informant who has proved highly reliable in the past—told me that Bird shot Gant with a shiny little pistol" by proclaiming that it merely wished to explain why it began investigating Bird.

Officers can sometimes provide "background information to explain the[ir] actions" without introducing hearsay. *United States v. Carrillo*, 20 F.3d 617, 619 (5th Cir. 1994). But we have not been so easily misguided by the government's purported desire to give the jury context. We do not accept the bare recitation of that motive as a substitute for cross-examination—the "only indicium of reliability sufficient to satisfy constitutional demands." *Crawford*, 541 U.S. at 69. So even if the government is correct that evidence is relevant to explain its investigative choices, we consider that evidence to be offered for the truth of the matters asserted if it "specifically links a defendant

---

[5] *See* Fed. R. Evid. 105; *United States v. Umawa Oke Imo*, 739 F.3d 226, 234 (5th Cir. 2014).

to the crime." *Jones*, 930 F.3d at 377 (quoting *Kizzee*, 877 F.3d at 659).

We have also repeatedly warned the government against "[b]ackdooring highly inculpatory hearsay via an explaining-the-investigation rationale." *Sharp*, 6 F.4th at 582. Those warnings predate even *Crawford*, which heightened courts' scrutiny of evidence incorporating nontestifying witnesses' testimonial statements. In *United States v. Evans*, 950 F.2d 187, 191 (5th Cir. 1991), we explained that such evidence is "inadmissible hearsay if it . . . points directly at the defendant and his guilt"; we admonished the government to be "circumspect in its use" and "trial court[s] [to] be vigilant in preventing its abuse." And we have long recognized that "testimony tend[ing] to point directly to a [defendant's guilt is] purely hearsay evidence of that fact." *United States v. Gomez*, 529 F.2d 412, 416 (5th Cir. 1976); *see also Brown v. United States*, 202 F.2d 474, 475 (5th Cir. 1953). Despite our litany of epistles on the subject, we were forced last year to describe violations of those principles as "a recurring problem." *Sharp*, 6 F.4th at 582.

The government must advance a specific reason why it needs to provide inculpatory "context" for its investigation. For instance, it may do so if the defendant opens the door by "challeng[ing] the adequacy of [the] investigation." *Kizzee*, 877 F.3d at 659. Otherwise, there is no reason why it cannot begin its account by explaining that it got a search warrant or that "a tip prompted" it to begin investigating a suspect. *Sharp*, F.4th at 582. Or, if it wishes to include the specifics of the tip, it is always free to call the tipster to testify. But it may not introduce "highly inculpatory out-of-court statement[s]" and call them nonhearsay context because their value for that purpose "pale[s] in comparison to the risk that the jury will consider" them for the truth of the matters asserted. *Id.*

Hamann says that's what happened here. He maintains that Stanley's testimony specifically linked him to the crime charged. The government

disagrees. It urges that Stanley's testimony was "for the purpose of explaining law enforcement's investigation and did not point specifically to the defendant." (quotation omitted). We agree with Hamann.

The challenged evidence linked Hamann to a meth-dealing conspiracy. It tended to prove that he sold several ounces—some before and some after meeting Davis—because Davis testified that he had sold Hamann only one ounce before the day he was arrested. But the tip described Hamann's selling "multiple ounces." It also described Hamann's selling meth to the confidential source. For the reasons we described earlier, those are powerful links to a meth-dealing conspiracy.

The government has not advanced any reason for needing inculpatory evidence to bolster the credibility of its investigation. Hamann has never contended that the investigation was inadequate. We perceive no reason why the government could not have begun its case-in-chief by explaining that officers arrived at the motel to execute a search warrant and found Hamann and Davis together in the parking lot holding distributable amounts of meth. The government's inculpatory prequel was "unnecessary" and "highly prejudicial." *Kizzee*, 877 F.3d at 659. It was far from "circumspect" and "limited." *Jones*, 930 F.3d at 377 (quotations omitted).

So as far as the Confrontation Clause is concerned, Stanley's challenged testimony was offered for the truth of the matters asserted. We proceed to ask whether Hamann had an opportunity to cross-examine the confidential source and the nontestifying officer and, if so, whether those witnesses were unavailable to testify.

### 3.

The government may introduce testimonial evidence from a nontestifying declarant when both (1) the declarant is unavailable to testify and (2) the defendant already had an opportunity to cross-examine her. *Kizzee*,

No. 21-50122

877 F.3d at 660; *Crawford*, 541 U.S. at 53–54.  A declarant is considered unavailable when the government fails to procure him after a good-faith, reasonable effort.  *Tirado-Tirado*, 563 F.3d at 123.  A defendant has had an opportunity to cross-examine a declarant when he has confronted the declarant "under circumstances closely approximating those that surround the typical trial," such as testimony given "under oath" and while the defendant is "represented by counsel."  *California v. Green*, 399 U.S. 149, 165 (1970).[6]  A defendant is not afforded the opportunity to cross-examine a witness just because he could have called the same witness to testify even though the state did not.  *Kizzee*, 877 F.3d at 661.

Hamann did not have an opportunity to cross-examine either the confidential source or the nontestifying officer.  The government has not disclosed the identity of the confidential source, and there is no indication that Hamann confronted the nontestifying officer in trial-like proceedings.  The government has also not shown that either witness was unavailable.  So neither necessary condition for absolving the government of its obligation to avoid introducing testimonial hearsay has been satisfied.

Accordingly, Hamann has established that Stanley's testimony violated the Confrontation Clause.  His conviction must be vacated unless the government can demonstrate that the error was harmless.

4.

Once the defendant makes out a Confrontation Clause violation, the burden shifts to the government to prove that "there was no reasonable possibility that the evidence complained of might have contributed to the

---

[6] *See also Tirado-Tirado*, 563 F.3d at 123 n.3 ("*Crawford* did not change the definition of 'unavailability' for Confrontation Clause purposes; pre-*Crawford* cases on this point remain good law.").

conviction." *Alvarado-Valdez*, 521 F.3d at 341 (alteration adopted) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).  In deciding whether the jury's verdict was "surely unattributable to the error,"[7] we focus on the harmfulness of the challenged evidence.  *Jones*, 930 F.3d at 379.  That is, we do not ask whether the "evidence remaining after excision of the tainted evidence" was sufficient to convict the defendant.  *Id.* (quotation omitted).

To decide how harmful the challenged evidence was, we consider how it was used.  If the government relied on the violative testimony in its closing argument, we are more likely to conclude that the error was harmful.  *Alvarado-Valdez*, 521 F.3d at 342.  If the government makes only "fleeting references" to the unconstitutional evidence, we are less likely to find harm.  *United States v. Sarli*, 913 F.3d 491, 498 (5th Cir. 2019).  And erroneously-introduced evidence is not harmful where it is relevant only to prove an element of the offense that the defendant does not contest.  *Id.* at 496–97.  Conversely, it is harmful where it "directly inculpated [the defendant] in [a] contested element of [the offense]."  *Jones*, 930 F.3d at 380.

The government seeks to carry its burden via three contentions.  *First*, it observes that the case against Hamann was otherwise "strong"—not least because of his "voluntary confession."  *Second*, it says that this case is different from *Alvarado-Valdez*, *Taylor*, *Kizzee*, and *Jones* because the violative evidence here was less incriminating than in those cases.  That's so, it claims, because the challenged evidence just duplicated other admissible evidence and because the government didn't rely on it "to prove the charged conspiracy."  *Third*, it urges that this case is like *Sarli* because the challenged testimony "did not involve a fact disputed by the defendant."

The government's first contention is inapt.  As we have explained, our

---

[7] *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

precedents foreclose consideration of whether the unchallenged evidence would hypothetically have been enough to convict Hamann. Doing so "would require retrying the case on appeal, at best, or engaging in pure speculation, at worst." *Alvarado-Valdez*, 521 F.3d at 343.

The government's second contention is wrong. While it's true that Hamann admitted to buying and selling meth, that didn't make Stanley's testimony "irrelevant." Hamann was indicted for a meth conspiracy that formed "on or about January 1, 2020[,] through on or about February 25, 2020." But most of Hamann's confession concerned meth deals between May and July 2019, well before he met Davis. Otherwise, he confessed only to selling meth to the confidential source during the controlled purchase, not to dealing "multiple ounces" before that day that would have been relevant to his conspiracy with Davis.

In any event, that reasoning strays too close to the impermissible contention that the government had enough other evidence to convict Hamann anyway. Stanley's testimony was relevant because it tended to prove that Hamann was involved in a meth-dealing conspiracy, and that fact makes it more likely that introducing it was harmful error.

The government also made more than "fleeting references" to the violative evidence in its opening statement and closing argument. *Sarli*, 913 F.3d at 498. Indeed, the prosecutor began his closing by describing the controlled purchase and referencing the confidential source, and he recounted those details early in his opening statement. In his closing statement, the prosecutor even returned to the controlled purchase as his first piece of evidence that he had "proved this case beyond a reasonable doubt." The government thus relied on the *subject* of the challenged testimony to prove its case, which is enough under our precedents, even if the government had other ways of establishing the same facts.

The government's third contention misconstrues *Sarli*. That case did not hold that an error is harmless "when the officer's testimony . . . did not involve a fact disputed by the defendant," as the government claims. As we reaffirmed in *Jones*, 930 F.3d at 380, *Sarli* held that erroneously introduced evidence is harmless where it can help prove only uncontested *elements* of the charged offense, not where it can establish only uncontested *facts*.

That distinction is critical. The defendant in *Sarli* acknowledged that he was carrying drugs but maintained that he didn't *know* that he was carrying drugs. *Sarli*, 913 F.3d at 497. The tip that may have violated the Confrontation Clause had nothing to do with Sarli's knowledge; it could have established only his possession. *Id.* at 496. What mattered was not that the fact of possession was undisputed but that the evidence could not have helped the government convict Sarli where the trial's sole purpose was to persuade the jury that Sarli knew he had drugs.

That's not true here. The government says that "Stanley's testimony concerning the informant's tip had nothing to do with establishing an agreement or conspiracy." Not only is that wrong, but it also contradicts the government's theory of the case. The prosecutor declared during his closing argument,

> [C]onspiracy to possess with intent to distribute is how drug dealers are typically charged. . . . The defendant was not cooking his own meth. . . . As soon as he agrees to buy that methamphetamine from somebody up higher in the chain to resell it, there is a conspiracy. As soon as he buys a distributable amount from William Davis, there is an agreement. There is . . . a conspiracy.

As we have explained, the fact that a defendant is capable of moving "multiple ounces" of meth strongly suggests that he is part of a drug-dealing conspiracy. So unlike in *Sarli*, and like in *Jones*, 930 F.3d at 380, the violative evi-

dence "directly inculpated" Hamann in a "contested element" of the offense: "the existence of an agreement between two or more persons to violate narcotics laws," *Valdez*, 453 F.3d at 256–57.

In fact, this case is precisely like *Jones*, where the defendant was also charged with conspiracy to possess meth with intent to distribute. We concluded that the putative conspiracy was "closely linked to Jones's alleged methamphetamine purchases" and so could not be distinguished from his conviction for possession. *Id.* at 380. We thus held that the government had not satisfied the "no 'reasonable possibility'" standard regarding that offense. *Id.* at 381 (quoting *Chapman*, 386 U.S. at 24). So too here.

The government has not proven that the challenged evidence could not have contributed to Hamann's conviction. Stanley's testimony was relevant to proving that Hamann was involved in a meth-dealing conspiracy, and the government repeatedly referenced the subject matter of his testimony during its opening statement and closing argument. So admitting the evidence that incorporated testimonial hearsay was harmful error.

## B.

Because Hamann's conviction cannot stand, we do not reach his claim that the district court erred in applying the career-offender sentencing enhancement. But we observe that Hamann acknowledges that his claim is foreclosed by precedent.[8] He seeks only to "preserve[ ] this challenge for Supreme Court review."

\* \* \*

The judgment of conviction is VACATED and REMANDED.

---

[8] *United States v. Kendrick*, 980 F.3d 432, 444 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2866 (2021); *Lightbourn*, 115 F.3d at 293.